824 So.2d 1089 (2002)
STATE of Louisiana
v.
Elzie BALL.
No. 2000-KA-2277.
Supreme Court of Louisiana.
January 25, 2002.
*1095 Marcia A. Widder, New Orleans, Counsel for Applicant.
Hon. Richard P. Ieyoub, Attorney General, Hon. Paul D. Connick, Jr., District Attorney, Rebecca J. Becker, Terry M. Boudreaux, Quentin P. Kelly, Gretna, Counsel for Respondent.
TRAYLOR, J.[*]
On July 11, 1996, a Jefferson Parish grand jury indicted defendant, Elzie Ball, for the May 15, 1996 first degree murder of Bernard "Ben" Scorsone. On May 23, 1997, the jury returned the unanimous verdict of guilty as charged. At the conclusion of the penalty phase, the jury unanimously returned the sentence of death, after finding two aggravating circumstances: 1) that the offender was engaged in the perpetration or attempted perpetration of an armed robbery; and 2) that the offender had been previously convicted of an unrelated armed robbery. On direct appeal to this Court under La. Const. Art. 5, § 5(D), defendant appeals his conviction and death sentence on the basis of 28 assignments of error.[1] We find that none of the arguments put forth constitute reversible error, and affirm the defendant's conviction and sentence.

FACTS
On May 15, 1996, Ben Scorsone was shot and killed during an armed robbery at The Pub Lounge in Gretna. Elsie Depew, the owner of The Pub Lounge, opened her business at 10:00 a.m., on the morning of the shooting. About 10 minutes later, defendant arrived as her first customer and ordered a Crown Royal. Elsie's husband, Herman, came into the bar briefly and saw a black man sitting at the bar. As Elsie was setting up her cash register, she engaged the stranger in conversation. When Elsie Depew asked the customer his name, he replied, "Joe."
In the meantime, Toby Theriot and Elwood Kishbaugh, employees of the gaming company that serviced the bar, arrived to remove the money from the bar's pool table, poker machines, and juke box.[2] Theriot conducted his business, but was a little uneasy about the stranger at the bar who had full view of the money he was counting. At one point, Theriot called out to Elsie Depew, at the other end of the bar by saying, "Hey Elsie." The defendant, sitting at the bar between Theriot and Elsie, quickly turned his head and looked toward Theriot. Both Elsie Depew and Theriot noticed this, but did not think anything of it at the time. After working about an hour, Theriot finished his count, and he gave Elsie the bar's portion of the money removed from the machines, approximately $1,700.00, and then he and Kishbaugh left.
A regular customer, Steve Combs, entered the bar between 11:15 and 11:45 a.m. He sat down, ordered a beer, talked to the bar's owners, and to the other customer, a black male wearing a cap, whom he did not know. He recalled that the man had several homemade tattoos. After Theriot and Kishbaugh left, Combs saw the other customer get up, walk to the front door, look out, and sit back down.
*1096 The bartender, Jerrie Twinn, arrived at the bar around noon, and noticed that sitting with Steve Combs was a black man she had never seen before. The first thing she did was count her register. After Elsie and Herman Depew left the bar at about 12:30-12:40 p.m., only Jerrie Twinn, Steve Combs and the defendant remained in the bar. The defendant ordered another drink, and offered to buy a beer for Steve Combs. Thereafter, the defendant got up, went outside and came back in. After he re-entered the bar, he stopped by the cigarette machine, and then pointed a chrome-plated revolver, cocked it, and hit Combs beside the head. The gunman told Jerrie, "This is a hold up," and told Combs, "You, you, into the bathroom." Combs complied and urged the robber to be cool. The defendant told Jerrie where to get all the money, as he had been observing the bar's procedures all morning, and apparently noted that money was kept in various places. Jerrie complied with his demands and placed the money in two money bags, then put one bag inside the other. Combs could hear the man telling her where the poker machine money was kept.
As Jerrie was handing the money bag to defendant, Ben Scorsone, the Budweiser man walked into the bar to make his delivery. The gunman came around from the other end of the bar and told Scorsone to get in the women's bathroom. Jerrie saw Scorsone grab the gun and a struggle ensued. Scorsone was knocked to the floor, face down. The defendant stood over Scorsone and shot three times. Twinn did not see Scorsone try to fight or resist after he was knocked down. Combs heard the scuffle through the bathroom door and thought the man had shot Jerrie Twinn.
Scorsone got up from the floor and walked out of the bar, telling Twinn to call 911. The gunman looked to the bathroom door, stared at Jerrie Twinn, then "strolled" out of the bar. Combs came out of the bathroom and heard Jerrie telling the 911 operator, "He shot the Bud man." Combs then went outside the bar, where he found Scorsone gasping on the ground with foam and blood coming from his mouth. Scorsone was dead when EMT personnel arrived.
Witnesses at the park across the street from the bar heard shots, and saw a maroon Buick, Oldsmobile or GM-type car drive away. Robert Lazarine saw the victim stumble out of the bar, followed by a black male carrying a money bag. Realizing that a robbery may have just taken place, Lazarine followed the gunman's car and used his cell phone to advise the police of their location.[3] But as the police arrived, Lazarine lost the maroon vehicle.
The police arrived on the scene at the bar and took separate witness statements, including a description, from each of the people who had encountered defendant that morning. From the descriptions, the police made a composite sketch of the gunman. Combs, who is an amateur artist, also made an independent sketch, which he gave to police. The police attempted to obtain fingerprint evidence from the bar, but no useable prints could be lifted.
Nine days later, the homicide department received a Crimestoppers tip naming Elzie Ball as a suspect in the murder. Detective Russell Lloyd developed a photographic lineup containing defendant's driver's license picture and five similarlyfeatured fill-ins. He showed the line-up to Jerrie Twinn, Steve Combs, Toby Theriot, Elsie and Herman Depew. In separate interviews, all five witnesses picked defendant *1097 as the man who sat in The Pub Lounge for approximately two and a half hours before robbing the bar and shooting and killing Ben Scorsone. Based on the positive identifications, Detective Lloyd obtained a warrant for defendant's arrest. A search of defendant's residence in Harvey during his arrest yielded photographs of the defendant with tattoos, a wallet, and a Federal .38 special round of ammunition.
On July 11, 1996, a Jefferson Parish grand jury returned an indictment charging the defendant with first degree murder. Defendant did not testify at either the guilt or penalty phase of his trial. After a trial in May 1997, the jury returned the unanimous verdict of guilty as charged. On July 15, 1997, defendant filed motions for a new trial and for post-verdict judgment of acquittal, which the trial court subsequently denied. On August 22, 1997, the trial court formally sentenced defendant to death by lethal injection. Thereafter, defendant moved for reconsideration of sentence, which the court denied.

DISCUSSION

VOIR DIRE ERRORS

Assignment of Error No. 1
Defendant urges that the trial court erred in allowing the State to "back accept" juror Ernestine Gilmore in place of juror Stephanie Richardson, a ruling which violated his right to equal protection in light of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The State succeeded in removing four African Americans by peremptory strikes, objected to each time by defense counsel under Batson.[4] Thereafter, the prosecutor sought to excuse Stephanie Richardson by peremptory strike. Subsequently, the defense objected to the state's peremptory strike against Stephanie Richardson, and the trial court cautioned, "I am becoming somewhat concerned with the number of blacks who are being excluded." However, after a chambers conference, the court permitted the State to strike Richardson peremptorily in exchange for seating Ernestine Gilmore, a previously excused African-American panelist. While we do not condone this unusual "back selection" procedure, the trial court's determination as to juror Gilmore did not impinge on defendant's equal protection rights.
Under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the prosecutor used his peremptory challenges to exclude potential jurors on account of race. See also La.Code Crim Proc. 795. The burden of production then shifts to the State to come forward with a race-neutral explanation, and if the raceneutral explanation is tendered, the trial court then must decide, in step three, whether the defendant had proven purposeful racial discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)(per curiam) (citations omitted); State v. Collier, 553 So.2d 815, 818 (La.1989). The second step need not demand an explanation that is persuasive, or even plausible, and unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. Purkett, 514 U.S. at 767, 115 S.Ct. at 1771. The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination. Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). The proper inquiry in the final stage of the *1098 Batson analysis is whether the defendant's proof, when weighed against the prosecutor's proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present. State v. Hobley, 98-2460, p. 18 (La.12/15/99), 752 So.2d 771, 782. A trial judge's determination pertaining to purposeful discrimination rests largely on credibility evaluations, so his findings are entitled to great deference by the reviewing court. Batson, 106 S.Ct. at 1724, n. 21.
During death-qualification, Richardson told the prosecutor that, "I feel the punishment should fit the crime; that not all crimes warrant the death penalty." The prosecutor asked if aggravating circumstances such as an intentional murder during an armed robbery were proved to her, could she then return a verdict of death. Richardson responded, "Yes, I think I can." She also stated that she could listen to mitigating evidence and consider a life sentence. After the Witherspoon voir dire, neither side challenged Richardson for cause.[5] Thereafter, the State used its eighth peremptory challenge to excuse Richardson. The prosecutor apparently anticipated the defense's Batson objection, and volunteered the following:
STATE: But before you do it, my notes indicate she's weak in the death penalty. Her answer was she thinks she can. I need jurors who know they can.
The defense was not satisfied, and renewed its Batson objection. After the prosecutor reiterated that Richardson said "she thinks she can," the court permitted the State to exercise the peremptory challenge against Richardson. Defense counsel persisted, urging the court to reconsider its ruling, and advising the court that it could force the State to keep Richardson. The prosecutor countered that he did not understand how the defense could see a pattern when the State used five out of eight peremptories to strike African-Americans, but at the same time, could not detect a pattern when the defense used eight out of its eleven peremptories to strike white males. Defense counsel defended his strikes on grounds that they were all directed toward removing prospective jurors as to whom the court denied the defense cause challenges. To get past the impasse, the trial court stated:
THE COURT: All right. Here is what I will do. I'm going to allow you all to call Ms. Richardson up [for additional questioning at the bench]; otherwise, I'm keeping her on, because I am beginning to become concerned with
Thereafter, Richardson came to the bench and agreed with her response that "the punishment should fit the crime," explaining:
MS. RICHARDSON: It mean that depending on the circumstance and as far as something extreme like his children were hungry or
STATE: His children what?
MS. RICHARDSON: Were hungry or he had to feed his family, then, yes, he should go to jail for life. But, no, I don't think he should die.
DEFENSE COUNSEL: Well, wait. What did you say, ma'am?
MS. RICHARDSON: Yes. Under those circumstances as far as his family being hungry or something like that, then, yes, he should go to jail for life. But, no, I don't think he should die. On the other *1099 hand, if he were just a [junkie], and, you know, then death.
DEFENSE COUNSEL: Then what? Then death, you said?
MS. RICHARDSON: Um-hum.
DEFENSE COUNSEL: So under certain circumstances
MS. RICHARDSON: Right.
DEFENSE COUNSEL:you could impose the death penalty?
MS. RICHARDSON: Under certain circumstances.
DEFENSE COUNSEL: And you could do it without hesitation?
MS. RICHARDSON: Right.
DEFENSE COUNSEL: All right. Thank you.
Richardson returned to her seat, and the parties continued to debate her responses at the bench. The prosecutor urged that her view of "having a hungry family" does not constitute mitigation, and thus, he reiterated that she was weak compared to other jurors. The trial court ruled that Richardson would stay, sparking another round of discussion at the bench:
STATE: Oh, Judge, then what about the male thing: I mean, five out of eight isthey have eight out of eleven.
THE COURT: I have not found any type of pattern with the exclusion of males or females but I am becoming somewhat concerned with the number of blacks who are being excluded.[6]
STATE: Well, then, the State will say this. If you think that that's true, then we wantif we've got to go back, if I thought the Court was going to do that, we would rather have Ms. [Tate] who was released earlier. We'd rather have her back than this juror.
* * *
THE COURT: Who released Ms. Tate?
STATE: We did. But she's a stronger juror than this one is. She's much stronger than this one.
THE COURT: Well, Ms. Tate's long gone now.
DEFENSE COUNSEL: You can back strike but you can't back 
STATE: Oh, Judge, this is wrong. This is wrong, Judge. This jury is weak on the death penalty. The case has got to be one hundred percent unanimous. Even if it's just the fact that I think the next few jurors are stronger, Judge, I have the right to make that determination.
* * *
DEFENSE COUNSEL: You made no challenge for cause for any of the black people that you are now excusing.
STATE: That's correct.
DEFENSE COUNSEL: I made a challenge for cause because I thought that the Judge was incorrect in ruling that the people who say, once I define the crime of first degree murder, people who say an intentional killing during an armed robbery, I am inclined, predisposed, automatically going to vote for death, et cetera; those people should have been challenged for cause. And those people have been the ones that I have exercised my peremptory challenges against.
STATE: Yes. Judge, the reason I didn't challenge them for cause was because I knew, and not just the black jurors, any juror who I put a "W" by as being weak, wasn't going to stay. That much I knew. So but I felt that they fell within the window, and that's my prerogative. *1100 I didn't want to challenge them for cause because I didn't think grounds for cause existed just like I didn't think grounds for cause existed in his case. But in any case, Judge, if for nothing else, I mean, Ms. Richardson is an acceptable juror in the window, but she is weak on the death penalty, particularly as compared to the next four jurors that are coming up. It's a decision that I can make to try to get the best juror I can.
DEFENSE COUNSEL: That's true
STATE: Wait a minute. If I had other jurors coming up who were very, very, weak, I might keep Ms. Richardson. It's just a tactical decision, Judge.
* * * And out of all of them, Ms. Richardson is the weakest of all of the ones on the death penalty. I mean, she fits within the window, but she's very, very, very weak.
THE COURT: All right. You may have opened up the door to a challenge on appeal. I'm going to allow you to use your peremptory. * * * But I've got some reservations here.
The trial court then ordered a five minute recess, and invited the attorneys into chambers to discuss this matter off the record. Upon returning, the State was permitted to maintain its peremptory challenge as to Richardson, in exchange for "back accepting" previously excused prospective juror Gilmore. The defense noted its objection to the resolution:
DEFENSE COUNSEL: I don't know that the Code provides for a back accepting, so
THE COURT: All right. In that none of these prospective jurors have at this time been excused, and in light of the State wishing to maintain its peremptory exception regarding Ms. Richardson, I am going toor rather their peremptory challenge, I'm going to allow them to go back and keep Ms. Gilmore and this is also in light of "Batson" concerns.
Defendant now claims that the trial court's "remedy" to allow the prosecutor to select a previously struck African-American juror, instead of Richardson, violated the principles of Batson. According to defendant, the remedy "did nothing to ameliorate the harm that the prosecutor's intentional discrimination visited upon Stephanie Richardson, Mr. Ball or the judicial system, and cynically transformed Batson's promise of equal protection into a quota rather than an anti-discrimination principle," and "treated Richardson as a fungible commodity readily interchangeable with any one of the mass of people who comprised the African American section of prospective jurors."
Defendant is clearly right that the seating of Gilmore in substitution for Richardson did nothing to vindicate Richardson's equal protection rights. Although Batson left to the lower courts the task of fashioning appropriate remedies to cure the use of race as a basis for selection, the "back accepting" of an already excluded juror on grounds of his or her race, in substitution for a juror improperly excluded because of his or her race, is almost certainly one remedy the Supreme Court would reject. See Batson, 476 U.S. at 99, n. 24, 106 S.Ct. at 1725. Since Cassell v. Texas, 339 U.S. 282, 295, 70 S.Ct. 629, 636, 94 L.Ed. 839 (1950) the fundamental equal protection concern has been not whether there has occurred a proportional inclusion or proportional limitation on the jury panel but whether the selection process has "consciously taken color into account." Cassell thus made plain over 50 years ago that "[a]n accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race." 339 U.S. at 287, 70 S.Ct. at 632. *1101 Cassell provides the impetus for the federal rule that even the exclusion of one juror on grounds of race may violate the Equal Protection Clause in the case in which other minority jurors have been accepted on the panel. United States v. Clemons, 843 F.2d 741, 747 (3rd Cir.1988). Proportional representation of minorities on a jury is therefore a non sequitur under the Equal Protection Clause and the trial court's concern in the present case for what it perceived as a growing imbalance on the panel did not alone justify manipulating the selection process according to the race of the jurors.
Nevertheless, the ill-advised strategy adopted by the trial court did not lead to a violation of the Equal Protection Clause in the present case because "it apparently was not motivated by a desire to discriminate purposefully against African Americans, nor was it apparently an attempt expressly to limit the number of African Americans who could serve." Ramseur v. Beyer, 983 F.2d 1215, 1228 (3rd Cir.1992) (ill-conceived plan of district court judge to balance the grand jury proportionately by rigging the selection process ultimately did not violate the Equal Protection Clause). Although the trial judge expressed his growing misgivings about the way in which jury selection was proceeding, he did not, in fact, rule that the defense had established a prima facie case of discrimination generally or that the prosecutor's raceneutral reason for excluding Richardson because she appeared "weak" on the death penalty was pretextual.[7] In fact, the prosecutor's exercise of a peremptory strike as to Richardson was race-neutral, State v. Williams, 96-1023, pp. 32-33 (La.1/21/98), 708 So.2d 703, 727 (state's assertion that juror appeared "weak, scary and shaky on the death penalty" accepted as race-neutral), and it was accepted by the trial judge. Therefore, whatever else may be said about the "back accepting" procedure in this case, it did not rest on the violation of Richardson's equal protection rights. Accordingly, the state's waiver of one of its previously granted peremptory challenges as to juror Gilmore did not prejudice defendant's equal protection rights either.
No discriminatory intent can be discerned from the State ultimately excusing Richardson in favor of Gilmore. Regardless of defendant's claims to the contrary, no equal protection violation occurred by the trial court allowing the State to "back select" an additional African-American juror whom it had previously excused. Otherwise, without the State having offered what really was a gratuitous gesture, defendant's jury would have been composed of only one African-American juror. The trial court's "remedy" fashioned after the court permitted the State to strike Richardson (itself a correct decision) did not prejudice defendant or violate any constitutional strictures on equal protection. This assignment is without merit.

Assignment of Error No. 4
Defendant claims that the trial court erred by denying the defense cause challenges as to prospective jurors Sintes, Tortorich and Jordan, based on their responses that they would automatically impose the death penalty for first degree *1102 murder.[8] The grounds for which a juror may be challenged for cause are set forth in La.Code Crim. Proc. art. 797. Two of these grounds are pertinent here, namely, that "[t]he juror is not impartial, whatever the cause of his partiality," and "[t]he juror will not accept the law as given to him by the court." La.Code Crim. Proc. art. 797(2) and (4).
A trial court is vested with broad discretion in ruling on challenges for cause and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189, pp. 6-7 (La.6/30/95), 658 So.2d 683, 686-87; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1280. Prejudice is presumed by a trial judge when a challenge for cause is denied erroneously by a trial court and the defendant ultimately exhausts his peremptory challenges. Robertson, 92-2660 at 3 4, 630 So.2d at 1280; State v. Ross, 623 So.2d 643, 644 (La.1993).[9] An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. Cross, 93-1189, p. 6, 658 So.2d at 686; State v. Bourque, 622 So.2d 198, 225 (La. 1993). In the instant case, defendant exhausted his peremptory challenges, and therefore, need only show that the trial court abused its discretion by denying his challenges for cause.
"[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990). The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (holding that a prospective juror who would vote automatically for a life sentence is properly excluded); see also Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); State v. Sullivan, 596 So.2d 177 (La.1992), rev'd on other grounds, sub nom. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). In a "reverse-Witherspoon" context, the basis of the exclusion is that a prospective juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him ..." Robertson, 630 So.2d at 1284.[10] Jurors who cannot consider both a life sentence *1103 and a death sentence are "not impartial," and cannot "accept the law as given ... by the court." La.Code Crim. Proc. art. 797(2),(4); State v. Maxie, 93-2158, p. 16 (La.4/10/95), 653 So.2d 526, 534-35. In other words, if a prospective juror's views on the death penalty are such that they would "prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths," whether those views are for or against the death penalty, he or she should be excused for cause. State v. Taylor, 99-1311, p. 8 (La.1/17/01), 781 So.2d 1205, 1214. The failure to disqualify a venireman unable to consider both life and death as penalties constitutes reversible error. State v. Divers, 94-0756, pp. 8-13 (La.9/5/96), 681 So.2d 320, 324-27.
In the instant case, seven panels of 13 prospective jurors were first questioned initially as to their views on capital punishment in pre-qualification rounds. Before questioning by the lawyers, the trial court informed each panel of the bifurcated nature of capital trials. The state's questioning was designed solely to discover those prospective jurors who would automatically vote for the death penalty as punishment for first degree murder, as well as those who would never consider death, to determine those excludable under Witherspoon, Wainwright, and Morgan. Once the judge had excused the panelists with extreme views under Witherspoon and Morgan, the general voir dire commenced, consisting of three panels of 13 "deathqualified" jurors, from which 12 jurors were selected. A fourth panel of general voir dire of eight prospective jurors yielded two alternate jurors.
The State secured neutral responses from the prospective jurors by inquiring broadly that they assume they have found defendant guilty in the first phase, and after hearing the aggravating and mitigating circumstances in the penalty phase, could they consider both life and death.[11] Once these objectively neutral responses *1104 were recorded, the prosecutor would then tender the panel to the defense attorney who promptly exposed them to the particular facts of this case: that this was an intentional murder, during the course of an armed robbery.[12] Defense counsel argues that the panelists' later responses undercut the credibility of their initial responses, and that the jurors should have been excused for cause.
Faith Sintes and Louis Tortorich were both questioned in the same pre-qualification panel. In response to the state's questions, Faith Sintes initially expressed an open mind as to imposing life imprisonment or the death sentence, depending on the circumstances. However, defendant points to the following colloquy to argue that she reflected more inclination toward the death penalty:
DEFENSE COUNSEL: All right. Ms. Sintes, the same questions to you. This man has already been found guilty of an intentional murder during an armed robbery. There's no question in your mind that he did it. And in the penalty phase, both aggravating and mitigating circumstances are presented to you. Can you tell me whether you would automatically be in favor of the death penalty?
MS. SINTES: I think I would automatically be in favor of the death penalty.
DEFENSE COUNSEL: So, Ms. Sintes, is what you're telling me then that there really wouldn't be any mitigating circumstances I could put on that would persuade you that life in prison would be an appropriate penalty?
MS. SINTES: If I feel like he did it intentionally, I think that wouldI feel like he would get the death penalty.
Over defense objection, the trial court denied the defense challenge for cause, indicating that Sintes had initially expressed an open mind regarding capital punishment.
Because a reviewing court is charged with determining whether the trial judge's denial of the defense cause challenge was an abuse of the court's broad discretion, the voir dire record as a whole merits scrutiny. State v. Cross, pp. 6-7, 658 So.2d at 686-87. Looking at Sintes's voir dire responses as a whole reveals that during the ensuing general voir dire, she introduced herself to the court as a resident of the East Bank, and an employee of Answerphone for 23 years. She and her husband, who was employed by Jefferson Parish pumping station, had one son and two grandchildren.
When the prosecutor asked the panel if the State proved each of the elements of first degree murder beyond a reasonable doubt, could they return a verdict of guilty, Sintes confessed, "Yes. It wouldn't be easy but" Finally, in response to a defense inquiry, she disclosed that she has a number of friends employed by the Jefferson Parish police department, but that fact would have no bearing on this case. Defense counsel then asked panelists, including Sintes, whether they could consider both aggravating and mitigating factors in the penalty phase as the law to determine whether death was warranted. Ms. Sintes answered affirmatively. After general voir dire, the parties approached the bench to make their selections, and defense counsel renewed his previous challenge for cause as to Sintes, which the *1105 court denied without discussion. Thereafter, counsel excused Sintes peremptorily.
Defendant complains that prospective juror, Louis Tortorich, was equally objectionable for similar reasons. Tortorich's initial response to the prosecutor expressed unequivocal neutrality, that under some circumstances, death would be appropriate, and under other circumstances, life would be the appropriate sentence. Defense counsel then queried whether the intentional aspect of the instant killing would cause him to vote for the death penalty:
MR. RHIELMANN: Okay. Mr. Tortorich, I'll ask you the same. Do you think you would ... consider life imprisonment if you found that what the offense was, was an armed robbery killing?
MR. TORTORICH: I don't think I'd consider life imprisonment.
* * *
MR. TORTORICH: I think if he had a loaded gun, he had an intention of using it, as something if he deemed it necessary.
MR. RHIELMANN: And so is what you're saying then that if you conclude that he killed a man during an armed robbery, that you'd think the death penalty is the appropriate penalty?
MR. TORTORICH: I think so.
The court denied the defense challenge for cause, finding that Mr. Tortorich fell within the parameters of Witherspoon. Examining Tortorich's voir dire as a whole reflects that Tortorich was a retired Bell South employee, whose wife works at AT & T Communications. He has two sons, a stepdaughter, and grandchildren. Tortorich indicated that he had heard some news reports about the crime at the time it occurred, but recalled no facts about the case. He disclosed that he previously served jury duty on a Jefferson Parish rape case, 14 years earlier, in which the verdict was guilty; however, that experience would have no impact on this case. During selection after general voir dire, counsel renewed his original challenge as to Tortorich based on his responses in the death-qualification rounds, which the trial court denied. Thereafter, the defense excused him peremptorily.
Finally, defendant complains that the trial court erroneously denied his cause challenge as to Garrett Jordan. Jordan was questioned during the seventh and final panel of pre-qualification. In that panel, the prosecutor asked generally if anyone would automatically favor the death penalty upon finding someone guilty of first degree murder. No one responded to the en masse inquiry, and thus no follow-up questions were presented to the panelists individually. Thereafter, defense counsel questioned Jordan:
MR. RHIELMANN: All right, Mr. Garrett Jordan, do you feel the same way, or do you think you'd be voting for the death penalty, given that you know he intentionally killed a man during an armed robbery?
MR. JORDAN: I would probably impose the death penalty.
MR. RHIELMANN: Okay. Do you have any idea what you'd want to hear before you decide that maybe you should spare his life?
MR. JORDAN: I guess the circumstances involved with it, you know? I'm not even sure how the person was killed, but when someone involves a gun and someoneit's hard for me to believe that he was trying to shoot him.
MR. RHIELMANN: Right. And all that is going to be determined in the guilt phase, I mean
MR. JORDAN: Right.

*1106 MR. RHIELMANN:you're going to have to have concluded that he intended to kill the man
MR. JORDAN: Sure.
MR. RHIELMANN:-during an armed robbery. So
MR. JORDAN: If I believed that he intended to kill the man, I would vote for the death penalty.
MR. RHIELMANN: If you believe he intended to kill the man, you will vote for the death penalty?
MR. JORDAN: Yes, I will.
MR. RHIELMANN: Then there won't be anything that could be done in the penalty phase to persuade you otherwise? If you're going to
MR. JORDAN: It's hard to say, but it would have to be pretty strong.
MR. RHIELMANN: All right. Thank you, sir.
Jordan further indicated that the governor's commutation power would not be a factor in his decision as to the appropriate penalty. Thereafter, defense counsel challenged Jordan for cause, which the trial court denied without comment, and counsel noted an exception.
Turning to Jordan's voir dire responses as a whole, he introduced himself as a resident of Gretna and a supervisor for Shell Oil Company, where he has worked for 15 years. He indicated that he heard conversation in the jury room that morning that the case was about "someone was committing the robbery and someone tried to intervene and was killed." He also related that he had served on a civil jury in Mobile, Alabama about seven or eight years ago, but the case settled out of court. He confirmed that if the prosecutor proved the elements of first degree murder beyond a reasonable doubt, he could return a verdict of guilty; and that following the penalty phase, if, after hearing the evidence, he felt death was the appropriate sentence, he could return that verdict as well. During the selection process at the bench, the defense renewed its challenge for cause as to Jordan, "given his responses of yesterday that he would be more inclined to vote for the death penalty." After the court denied the challenge, and noted the defense objection, the defense exercised a peremptory challenge to remove Jordan.
Defendant argues that the trial court erred in denying the challenges for cause for these three jurors based on prior decisions by this Court requiring reversal based on challenges for cause. Divers, 94-0756, pp. 8-13, 681 So.2d at 324-27 (reversing the conviction and death sentence on grounds that the trial court erred by denying cause challenges for jurors who would automatically impose death sentence for premeditated murder); Maxie, 93-2158, pp. 15-24, 653 So.2d at 534-38 (vacating a first degree murder conviction and death sentence because the trial judge erroneously denied a defense challenge for cause of a venireman who, though he said he "could listen" to mitigation evidence, felt death the only appropriate punishment "[o]nce the crime guilt is established."); Robertson, 92-2660, pp. 3-8, 630 So.2d at 1281-84 (vacating a first degree murder conviction and death sentence because the trial judge erroneously denied a defense challenge for cause of a venireman who, though he stated he could perform his duties according to the judge's instructions, nonetheless stated he had his "opinion" on the appropriateness of the death sentence for double murder); Ross, 623 So.2d at 645 (La.1993) (vacating a first degree murder conviction and life sentence because the trial judge erroneously denied a defense challenge for cause of a juror who said he could "consider" both the death penalty and life imprisonment but *1107 "personally" had his "vote" for capital punishment as "the only penalty" in a murder trial).
However, more recently, this Court decided two cases involving the same issue as raised herein. In State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276, this Court rejected the capital defendant's claim that the trial court erred when it denied his challenge for cause based on a prospective juror's inability to return a life sentence in case of intentional murder. In Chester, the Court summarized the juror's responses during voir dire as follows:
Ms. Galloway responded to the state's questioning that she would listen to both the aggravating and mitigating circumstances in an appropriate case return a life sentence. Later, when questioned by defense counsel, she replied that there was a contradiction between specific intent and mitigating circumstances. When defense counsel attempted to explain mitigating circumstances, she replied that she understood them; however, her responses indicated that she was confused about the application of mitigating circumstances in a specific intent crime because she thought mitigating circumstances could apply only when the crime was accidental. However, she also stated in her colloquy that she would listen to both mitigating and aggravating circumstances, and "make a judgment based on what is presented."
Chester, 97-2790 at 14-15, 724 So.2d at 1285-86. The Court concluded that based on her entire colloquy, it did not find the juror expressed "an unconditional willingness to impose a death penalty under any and all circumstances" and determined that the trial court did not abuse its discretion when it denied the cause challenge. Id.
Similarly, in State v. Taylor, 99-1311 (La.1/17/01), 781 So.2d 1205, the Court considered the voir dire responses of prospective juror, Ms. Funk. Like the instant case, when examined by the state, Ms. Funk stated that she could consider the evidence of the case, as well as mitigating evidence in deciding whether to vote for death or a life sentence. Under defense questioning, Ms. Funk stated that she would consider only the death penalty as a sentence if the murder were intentional. Taylor, 99-1311 at 7-9, 781 So.2d at 1213-15. The Court observed:
In capital cases, the trial judge makes personal observations of potential jurors during the entire voir dire, and a reviewing court should accord great deference to the trial judge's determination and should not attempt to reconstruct voir dire by microscopic dissection of transcript in search of magic words or phrases that automatically signify juror's qualification or disqualification. Likewise, a prospective juror who indicates his or her personal preference for the death penalty need not be stricken for cause. Not every predisposition or leaning in any direction rises to the level of substantial impairment.
Taylor, 99-1311 at 11, 781 So.2d at 1216-17 (internal citations omitted) (emphasis added). Accordingly, this Court held that the trial court's denial of the challenge for cause as to Ms. Funk was permissible.
The voir dire in the instant case resembled that of Taylor and Chester in that neither the court nor the prosecutor found it necessary to rehabilitate the three jurors, Sintes, Tortorich, and Jordan, after defense counsel extracted such sentiments. The State seemed confident that the initial responses in which all three expressed open minds would suffice. Similarly, the trial court appeared satisfied, even in the face of such responses as Sintes indicating *1108 "automatic" death, that the cause challenges were all properly denied. In addition, the trial judge seemed perturbed with defense counsel's use of the term "intentional," and thus, the judge apparently discounted responses yielded from that discourse, as reflected in this colloquy with the court regarding Ms. Sintes:
THE COURT: Ms. Sintes.
STATE: Okay.
DEFENSE COUNSEL: Cause.
THE COURT: All right. She said she wouldat first she said she was open-minded. She would automatically favor the death penalty if it was an intentional killing.
STATE: Under "Witherspoon," Ms. Sintes is as qualified because she's predisposed to death, just like Misteris it Spanglebergis pre-disposed toward life. They fit with inside that window.
Now, you know, they're just not susceptible to a challenge for cause. Being pre-disposed one way or the other is not a grounds for cause. Under Witherspoon, cause is when they refuse to consider the other side and would do it automatically in all cases. You don't have a juror on this panel that said that.
DEFENSE COUNSEL: Oh, I think you do. You have Ms. Sintes stating that there is nothing she would consider in mitigation.
THE COURT: Unh-unh. She said
DEFENSE COUNSEL: I think she said that.
THE COURT:if it was an intentional killing, and she first stated that she was open-minded. I find her acceptable.
DEFENSE COUNSEL: Okay, Judge, but she says she's open-minded but they don't define first degree murder. I mean, they don't get to the penalty phase if they don't find it's intentional
THE COURT: All right. But intentional killing is not defined, either.
* * *
DEFENSE COUNSEL: I don't know what more definition I need to give it thanI mean, it leaves open
THE COURT: That someone was shot during an armed robbery.
DEFENSE COUNSEL: But it's got to be intentional. It can't be an unintentional killing during the course of an armed robbery. That's second degree murder.
A first degree murder, the only way we get to the penalty phase is if they decide it was an intentional killing....
THE COURT: Well, I think she falls within those parameters in "Witherspoon." She's accepted.
The trial judge seemed to credit their initial responses in which they both answered objectively that they could consider both life imprisonment as well as the death sentence, i.e., they were not Witherspoon or Morgan extremes. In the subsequent general voir dire, the jurors again indicated that they could consider both aggravating and mitigating factors to determine the imposition of a sentence. Like the findings in Chester and Taylor, the respective jurors in this case, namely Sintes, Tortorich, and Jordan, displayed voir dire responses which, in the totality, reflected their ability to consider the whole picture before deciding what sentence to impose.
In reviewing Sintes' responses, her use of the term "automatically" is troubling. However, viewing the voir dire exchange as a whole, it seems more likely that her response merely mirrored the defense counsel's use of the term in the question put to her. Even on review of a cold record, her other responses using "I think... I feel ..." and her comment that "it would be hard" to convict the defendant do not suggest a juror who would grant the *1109 death penalty in all circumstances. Similarly, while both Tortorich and Jordan indicated a predisposition toward the death penalty when questioned about an "intentional" murder, their responses as a whole, such as Tortorich's "I think so," and Jordan's requirement that the mitigating circumstances be "pretty strong," do not rise to the level of Witherspoon and Morgan extremes.
When a prospective juror has volunteered an opinion seemingly prejudicial to the defense, but on further inquiry demonstrates the ability and willingness to decide the case impartially according to the law and evidence, a challenge for cause is not warranted. State v. Heard, 408 So.2d 1247 (La.1982); see also State v. Bates, 397 So.2d 1331 (La.1981). In State v. Shea, 421 So.2d 200 (La.1982), cert. granted 466 U.S. 957, 104 S.Ct. 2167, 80 L.Ed.2d 551 (1984), reversed on other grounds, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985), on remand, 466 So.2d 449 (La. 1985), the defendant argued that the trial court erred in denying its challenge for cause of prospective juror Nathaniel Williams on the grounds that on the voir dire examination he was not impartial and would not accept the law as given the court:
We believe the juror's initial answers in this instance were brought about more from a lack of understanding of the law than bias. From our review of the entire voir dire examination we are convinced of the juror's ability and willingness to decide the case impartially according to the law and evidence. We therefore conclude that the trial judge did not abuse the broad discretion vested in him in ruling on this challenge for cause.
Shea, 421 So.2d at 205 (citations omitted)(emphasis added); see also State v. Robertson, 97-0177, p. 42 (La.1998), 712 So.2d 8, 40 (finding no error because jurors could not be expected to be familiar with the legal term "movable"); State v. Bell, 477 So.2d 759 (La.App. 1 Cir.1985) ("A prospective juror is not trained in the law and could not be supposed to understand jurisprudential distinctions in a abstract context."); State v. Jarreau, 476 So.2d 1 (La.App. 4 Cir.1985) (finding that the trial judge erred in limiting voir dire because "attitudes are better discovered through informal questioning keyed to common experience than formal recitations of legal requirements").
Applied to the instant jurors, this Court's reasoning from State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845, is instructive:
When the trial judge throughout the voir dire demonstrates an awareness of the proper legal standard, and when there is nothing in the record of the voir dire that, taken as a whole, shows a substantial impairment of the prospective juror, a reviewing court should defer to the trial judge's determination with respect to challenges for cause.
Lucky, 96-1687 at 7-8, 755 So.2d at 850-51. The trial judge, in the present case, was satisfied that the jurors could render an impartial verdict according to the law and evidence despite the jurors' questionable responses in the abstract on pre-qualification. Applying the jurisprudence to the instant set of facts, the trial judge did not abuse his wide discretion in determining that the prospective juror could be impartial.
In addition, we agree with the State's argument that defense counsel's questioning was improper, because he "related the facts which the State would try to prove beyond a reasonable doubt and [then] demanded a commitment from prospective jurors about whether they *1110 would automatically vote for the death penalty if those facts were found." As a general matter, an accused in a criminal case is constitutionally entitled to a full and complete voir dire examination. La. Const. Art. I, § 17. The purpose of voir dire is to determine the qualifications of prospective jurors by testing their competency and impartiality and to assist counsel in articulating intelligent reasons for exercise of cause and peremptory challenges. State v. Stacy, 96-0221, p. 5 (La.10/15/96), 680 So.2d 1175, 1178. The scope of voir dire is within the sound discretion of the trial judge and his rulings will not be disturbed on appeal absent a clear showing of an abuse of discretion.
Nevertheless, voir dire does not encompass unlimited inquiry by defendant into all possible prejudices of prospective jurors, including their opinions on evidence, or its weight, hypothetical questions, or questions of law that call for any prejudgment of supposed facts in the case. Louisiana law clearly establishes that a party interviewing a prospective juror may not ask a question or pose a hypothetical which would demand a commitment or pre-judgment from the juror or which would pry into the juror's opinions about issues to be resolved in the case. "It is not proper for counsel to interrogate prospective jurors concerning their reaction to evidence which might be received at trial." State v. Williams, 230 La. 1059, 89 So.2d 898, 905 (1956). See also State v. Square, 257 La. 743, 244 So.2d 200, 226 (1971), judgment vacated in part, 408 U.S. 938, 92 S.Ct. 2871, 33 L.Ed.2d 760 (1972), mandate conformed to, 263 La. 291, 268 So.2d 229 (1972)("Voir dire examination is designed to test the competence and impartiality of prospective jurors and may not serve to pry into their opinions concerning evidence to be offered at trial"); State v. Smith, 216 La. 1041, 45 So.2d 617 (1950)("hypothetical questions and questions of law are not permitted in the examination of jurors which call for a pre-judgment of any supposed case on the facts").
On at least one occasion, and specifically during the questioning of the panel occupied by Sintes and Tortorich, the State interrupted defense counsel when he asked if a panelist would automatically vote for the death penalty, knowing that the case was a murder during an armed robbery. At the bench, the prosecutor gave the following objection:
I've got a copy of "Witherspoon: here and it's improper to ask them how they're going to vote. And I can understand what Mr. Rhielmann's getting to, but he's asking them for a commitment as to how they're going to vote.
In the present case, defense counsel went beyond offering the jurors one or two circumstances which might play a critical role in the trial to give jurors a narrative summary of what the undisputed evidence would show at trial: that the victim died intervening in an armed robbery which had placed several persons at risk of losing their lives. Clearly, as counsel's summary of what he anticipated the evidence will show at trial became more and more detailed, he ran afoul of this Court's general rule barring precommitment of jurors to a particular result when he then asks jurors whether they would "consider" reaching that result.
In the instant case, the trial judge apparently perceived the responses of Sintes, Tortorich and Jordan to mean that their predisposition toward the death penalty was balanced with a willingness to consider mitigating circumstances. At the end of the day, the voir dire of the present case is analogous to Taylor and Chester, where viewing the voir dire answers of Sintes, Tortorich, and Jordan as a whole, we do *1111 not find any abuse of discretion given that the jurors initially expressed the ability to consider mitigating circumstances before deciding on a verdict and accordingly, did not demonstrate "an unconditional willingness to impose a death penalty under any and all circumstances." Chester, 97-2790, pp. 14-15, 724 So.2d at 1285-86. In light of Lucky, Chester and Taylor, this assignment of error is without merit.

PENALTY PHASE ERRORS

Assignment of Error No. 15
Defendant alleges that the erroneous introduction of the prior testimony of Salvador Campagna requires vacation of the death sentence. To support the aggravating circumstance that defendant was previously convicted of an unrelated armed robbery,[13]see La.Code Crim. Proc. art. 905.4(A)(3), the State introduced Ex. SP 4 A, a certified copy of documents evidencing the conviction.[14] Pursuant to State v. Jackson, 608 So.2d 949, 955 (La.1992), the State also sought to introduce the transcribed trial testimony of one of the victims of that robbery, Salvador Campagna, who had died in the intervening 20 years. Outside the presence of the jury, defense counsel objected to introducing the transcript of Salvador Campagna. The trial court ruled the previous testimony admissible. Defendant argues that by allowing Campagna's transcribed testimony to be read to the jury, the trial court violated his constitutional rights to confront and crossexamine the witnesses against him.
Specifically, the defendant argues that the State did not establish that Salvador Campagna was unavailable to testify in this proceeding. Defendant claims that the state's showing was inadequate to prove the witness's unavailability. La. Code Evid. art. 804(A)(4) provides that a witness is considered unavailable to testify when he or she is dead; thus, the State could avail itself of La.Code Evid. art. 804(B)(1). La.Code Evid. art. 804(B)(1) provides, as does its federal counterpart, Fed. R.Evid. 804(b)(1), an exception to the hearsay rule for testimony given by an unavailable declarant as a witness in another hearing of the same or a different proceeding, "if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." La.Code Evid. art. 804(B)(1) incorporates a firmly-rooted exception to the hearsay rule. Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895).
*1112 Determining the unavailability of a witness is a preliminary question for the court. La.Code Evid. art. 104(A). Such determinations are reviewed for manifest error, and will not be overturned, absent an abuse of the trial court's discretion. This Court has held that use of the prior testimony must not impinge on the defendant's constitutional right to confront and cross-examine adverse witnesses, as guaranteed by the Sixth Amendment of the United States Constitution, Art. I, § 16 of the Louisiana Constitution, and La.Rev.Stat. § 15:273. State v. Hills, 379 So.2d 740, 743-44 (La.1980); see also State v. Pearson, 336 So.2d 833, 835 (La.1976); State v. Ghoram, 328 So.2d 91, 93-94 (La. 1976). To protect these constitutional rights, certain conditions must be met before the prior testimony may be introduced: (1) the defendant must have been represented by counsel at the earlier hearing; (2) the witness must have testified under oath; (3) the witness must have been cross-examined (or there must have been a valid waiver of the right to crossexamination); (4) at the time of trial, the witness must be "unavailable" to testify; and (5) the State must have made a good faith effort to locate the unavailable witness. Hills, 379 So.2d at 743-44. These jurisprudential criteria are subsumed in La.Code Evid. art. 804(B)(1), permitting the use of prior recorded testimony of an unavailable declarant as an exception to the hearsay rule.
Here, defendant faults the State for presenting a certified copy of a death certificate issued by the New York State Department of Health, indicating that on August 1, 1982 "Salvatore a/k/a Salvador Campagna" died. The certificate reflected Mr. Campagna was born in Louisiana on November 27, 1907 (i.e., age 74 at death) and his occupation was listed as "blacksmith." Defendant claims that this cannot be the same individual who testified in his 1975 armed robbery trial because the St. Bernard Parish police report from that crime lists the victim as "Salvador A. Campagna, W/M 49 RT. 1, Box 168, Meraux, LA." Confusingly, the previous page of the 1974 police report described the shooting victim as "Sal Campagna, W/M, 47 yr." Thus, defendant now argues that the Salvador Campagna, who was either 47 or 49 years old at the time of the 1974 robbery, would have only been either 55 or 57 years old on his date of death, August 1, 1982. However, the individual described in the New York death certificate appears to have died at age 74. Defendant further claims that the State presented no evidence to establish that the dead Salvador Campagna was the same person as the witness whose transcribed testimony the State sought to introduce. Thus, defendant asserts that the trial court erred by admitting the prior testimony when the two Campagnas "were not the same person."
The record reflects that defense counsel pointed out these age discrepancies to the trial court before it ruled on the admissibility issue. The prosecutor responded that the 1974 police report actually reported two ages for Campagna, and argued that he was unaware where the reporting officer obtained his information because the witness was in the hospital after the robbery. The prosecutor offered, that if the trial court were not satisfied, he would call to the stand the investigator who learned Campagna had died in New York. Apparently the trial court was satisfied, because the investigator did not testify.
Thereafter, the trial judge ruled that the discrepancies were not significant to a point which would lead him to question whether the State had provided a valid death certificate for Salvador Campagna. The court found it quite possible that Mr. Campagna may have listed his age differently *1113 from what it actually was, and that his occupation had changed over time. The trial court also noted that the decedent obviously would not provide his age for the death certificate, to which defense counsel responded that his wife did. Accordingly, the trial court admitted the 1975 transcribed testimony of Salvador Campagna, and thereafter, the testimony was read aloud to the jury. The trial court obviously found that the State made a good faith investigation to locate the witness, and in doing so, determined that the individual was dead, and thus unavailable, without further evidence necessary to justify that conclusion from the State's investigator. Under manifest error review, we cannot say that the trial court abused his discretion in reasoning that valid reasons may exist for the discrepancies.
However, even if the trial court erred in allowing the testimony, the error was harmless under the circumstances. The State had already introduced evidence to establish the prior conviction; and the defense was offered the opportunity to offer other transcripts, and in fact presented the prior testimony of another witness, Sue Gurganus, who testified to the identity of a different shooter in the 1975 trial. The defendant also cannot argue that his constitutional right of confrontation was violated because Campagna was subject to cross-examination in the prior trial.[15]
Moreover, the evidence was offered to establish a prior armed robbery as an aggravating circumstance. However, the jury returned with two aggravating circumstances. The failure of one aggravating circumstance does not invalidate a death penalty sentence if another aggravating circumstance is supported by the record. State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190. This assignment is without merit.

Assignment of Error No. 19
Defendant claims that the trial court erroneously permitted the State to introduce proof of defendant's sentence for the 1975 armed robbery. Before the penalty phase began, defense counsel made a motion that the certified copy of defendant's previous conviction for armed robbery be redacted to remove any mention of the sentence defendant received for that offense. The trial judge disagreed, finding that under State v. Jackson, 608 So.2d 949, 955 (La.1992), the sentencing document is considered part of the adjudication in its entirety. Defense counsel objected.[16] Regardless whether the jury even noticed the sentencing page on Ex. SP 4-A, thereafter, defense counsel drove the point home for them by querying the corrections expert on the matter.[17]
*1114 Defendant now claims that proof of the 30-year sentence he received on the previous armed robbery conviction introduced an arbitrary element into the sentencing decision because it invited the jury to impose a death sentence in part to punish him on the prior offense for which the jury may have believed he received inadequate punishment,[18] thereby creating the risk that defendant will be sentenced anew for a crime for which he has already been punished, in violation of double jeopardy principles. Further, defendant claims the State exploited the erroneous introduction of the evidence of his previous 30-year sentence, of which defendant served only 16 years, to suggest that a life sentence would not, in fact, ensure that defendant remained in prison for the remainder of his life.[19]
La.Code Crim. Proc. art. 905.2 provides that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on the family members." The State introduced the documents in support of the aggravating circumstances listed in La.Code Crim. Proc. art. 905.4(A)(3) that the offender has been previously convicted of various enumerated serious felony offenses including armed robbery. Significantly, art. 905.4(A)(3) refers only to an offender previously convicted of the enumerated crimes, not previously convicted and sentenced.
In Jackson, this Court declared that "evidence of convictions of serious unrelated crimes is extremely relevant to the character and propensities of the defendant." 608 So.2d at 954. Jackson addressed the state's use of felony convictions other than those listed as an *1115 aggravating circumstance in La.Code Crim. Proc. art. 905.4(A)(3) as character and propensity evidence under La.Code Crim. Proc. art. 905.4(A)(2). However, Jackson limits proof of a capital defendant's prior conviction "to the document certifying the fact of conviction and to the testimony of the victim or of any eyewitness to the crime." Id. (emphasis supplied). The Jackson opinion is silent as to whether a prior sentence may be disclosed.
This raises a res nova issue for this Court in a quarter-century of capital jurisprudence. Although La.Code Crim. Proc. art. 905.4(A)(3) and Jackson appear to support a restrictive approach to the proof of a prior conviction, La.Code Evid. art. 609.1(C), governing impeachment of a witness by his prior convictions, explicitly states that "[o]rdinarily, only the fact of a conviction, the name of the offense, the date thereof, and the sentence imposed is admissible." The trial court's view in the present case that the sentence imposed upon a prior conviction logically forms part of a single adjudicative process therefore has some support in Louisiana law.
At least as an abstract proposition, only the criminal act involved in the prior conviction, and not the sentence the defendant received, has any logical bearing on the defendant's character and propensities, which is the focus of a capital sentencing hearing in Louisiana. However, the state's case must satisfy not only abstract logical consistency but also "jurors' expectation about what proper proof should be." Old Chief v. United States, 519 U.S. 172, 188, 117 S.Ct. 644, 654, 136 L.Ed.2d 574 (1997). Here, in evaluating the state's proof of defendant's unrelated armed robbery, the jury was surely not so naive as to think that the defendant was not punished for his 1975 crime. Accurate information in this regard may forestall unnecessary jury speculation about the reasons why information they would expect to receive concerning the prior conviction remains undisclosed.
Information about the prior sentence is also important for another reason which relates directly to the focus of the capital sentencing hearing. The intensity of the defendant's criminal conduct is relevant to a jury's consideration of his character and propensities because it reflects on his or her potential for rehabilitation. In an extreme case, a defendant's commission of capital murder only days after his release from jail on a sentence for a prior conviction would factor into any jury's determination of his character and propensities. While appellate counsel assumes that this knowledge would always inure to a defendant's detriment, and that such knowledge would cause juries to make a harsher sentencing decision, the converse could also be true. A defendant who had shown an extended period of maintaining a law-abiding life may cause the jury to weigh that character trait in mitigation. In the present case, five years separated defendant's release on his sentence for the prior armed robbery and the commission of the present crime. For all that appears, jurors may have considered the five-year gap sufficient to negate the length of defendant's prior sentence and the timing of his release altogether as factors bearing one way or the other on their sentencing determination.
Nevertheless, even relevant sentencing information may be overplayed by the State to such an extent that it interjects an arbitrary factor tainting a jury's capital sentence. In State v. Loyd, 96-1805 (La.2/13/97), 689 So.2d 1321 (La. 1997), this Court held that the commutation statute, La.Code Crim. Proc. art. 905.2(B), which requires the trial court to instruct the jury that the governor is empowered *1116 under the State constitution to commute sentences, "gives an accurate statement of the law and affords the defendant the opportunity to present evidence concerning the frequency and extent of the use of this power." Loyd, 689 So.2d at 1333. Justice Lemmon added the following concurring opinion:
The pertinent instruction, which is a concise and accurate statement of the law, does not alone interject an arbitrary factor into the sentencing proceeding and therefore does not violate due process. See California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). However, the instruction very well may lead to due process violations if the prosecutor, by evidence or argument, ventures into the possible consequences of commutation, or if the prosecutor and defense counsel overemphasize the issue to such an extent that the jury's attention is diverted from its function of determining the sentence based on the circumstances of the murder and the character and propensities of the murderer.

Loyd, 96-1805 at 1, 689 So.2d at 1336 (Lemmon, J., concurring).[20]
Contrary to appellate counsel's contentions, the State did not unfairly exploit the disclosure of the 30-year sentence. Rather, the prosecutor's rebuttal argument openly invited jurors to consider with regard to their option of returning a sentence of life imprisonment at hard labor without benefit of parole that defendant had previously received a 30-year sentence, also without benefit of parole, on his armed robbery conviction, and yet secured his release from the penitentiary well short of his full-term date. The defense penalty phase expert attempted to defuse the issue by explaining to jurors that in contrast to sentences imposed for armed robbery, "Lifers can not earn their release through good-time." In fact, the expert's statement was only partially correct. Inmates serving life sentences "will be credited with good time earned which will be applied toward diminution of their sentences *1117 at such time as the life sentences might be commuted to a specific number of years." La Rev. Stat. § 15:571.3(B). A full and accurate statement of the life option available to the jury in a capital sentencing hearing therefore includes not only the possibility of a governor's exercise of his powers of commutation and pardon but also the possibility of further diminution of sentence by good time credits following any commutation of a life sentence to a fixed term of years. It was therefore not necessarily unfair for the prosecutor to ask jurors to consider what defendant's sentence "without benefit" on his prior armed robbery conviction meant in practical terms when they considered their "life option" at the close of the sentencing phase. Given the relatively brief nature of the comments, the prosecutor's argument in this regard does not appear to have interjected an arbitrary factor into the proceedings. This assignment of error fails to warrant reversal of the defendant's sentence.

CAPITAL SENTENCE REVIEW
Under La.Code Crim. Proc. art. 905.9 and La. S.Ct. R. 28, this Court reviews every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has filed the Uniform Capital Sentence Report required by La. S.Ct.R. 28 § 3(a) and the Department of Public Safety and Correction submitted a Capital Sentence Investigation Report ("CSIR"). See La.S.Ct.R. 28 § 3(b). In addition, the State filed a Capital Sentence Review Memorandum and the defense filed "Defendant's Objections to the Uniform Capital Sentence Report."
Those documents indicate that defendant is an African American male born on June 14, 1953 to the marital union of Peggy V. Morris Ball and Thad Elzie Ball. Defendant was one of four children born of that union. His parents separated when defendant was approximately two years old. Defendant's father was killed when defendant was four years old. He was raised in the B.W. Cooper Housing Project by his mother, who worked as a housekeeper. She died in 1970.
On March 15, 1996, defendant married Michelle Harris Ball, with whom he has two children, Erin and Ebony, ages two and a half, and two, at the time of trial. At the time of this offense, they lived in Harvey, Louisiana. Defendant also supported Michelle's two daughters, not his biological children, Brooke and Kirsty, ages eight and five. No work history for defendant is listed, however, his sister-in-law testified that he worked with "George and Jackie" at their club, but when the prosecutor cross-examined him as to whether defendant had ever in fact had a job, she confessed, "I couldn't tell you that either."
Defendant described his health as suffering from diabetes, hepatitis C, hypertension, and arthritis. He stated that he has no history of mental problems, or any drug or alcohol abuse problems. Defendant's highest grade attended in school was 8th, and he attained a GED while incarcerated in 1982. His IQ is unknown and no psychiatric evaluation was performed. However, sanity was not an issue at trial.
Defendant's criminal history began in July, 1971, in Orleans Parish, when he was *1118 charged with municipal theft and receiving stolen things. The theft count was dismissed, and he was sentenced to pay a fine of $75, or 30 days in jail on the second count. In January, 1972, he pled guilty in Orleans Parish to unauthorized use of a moveable, and was sentenced to six months in parish prison. Concomitant charges of one count of theft and one count of receiving stolen things were refused by the state. In July, 1972, defendant was sentenced to 15 days in Orleans Parish Prison for committing the municipal offense of discharging a firearm. In conjunction therewith, the city entered a nolle prosequi as to a criminal damage to property offense. In September, 1972, defendant pled guilty in Orleans Parish to illegally carrying a weapon, and was sentenced to five months parish prison. In October, 1972, defendant was charged with one count of theft, one count of simple robbery, and one count of armed robbery. In April, 1973, defendant pled guilty to the theft charge and the simple robbery charge was refused. The probation and parole department's report reflects that, as to the armed robbery count, defendant "pled guilty to a lesser offense and received a six-month sentence in parish prison." In December, 1973, defendant was charged municipally with resisting arrest, disturbing the peace, and refusing to work. Two of the charges reflect a disposition of "continued," and the third reflects "no disposition found."
In December, 1973, defendant was charged in Jefferson Parish with two counts of armed robbery. In March, 1974, one count was refused, and the other count was dismissed.
In April, 1974, defendant was charged in Orleans Parish with gambling and possession of a schedule III narcotic. Both counts were refused in April, 1974. In May, 1974, defendant was charged in Orleans Parish with disturbing the peace. The charge was dismissed later that month. In June, 1974, defendant was charged with armed robbery in Orleans Parish, but the charge was later refused. In November, 1974, defendant was charged in St. Bernard Parish with armed robbery, attempted murder, and aggravated battery.
In January, 1975, defendant was charged in Orleans Parish with simple and aggravated escape. After two days, the charges were refused. In conjunction, he was also charged with receiving stolen things and theft. Those two offenses were both nolle prossed in April, 1975. In April 1975, defendant pled guilty to armed robbery, and was sentenced to 30 years imprisonment at hard labor, "without benefit." The aggravated battery count was refused and the attempted murder count was "continued."
In May 1996, defendant was charged with the instant offense of first degree murder, and a concomitant count of armed robbery was refused by the state. At the penalty phase, the State presented brief victim impact testimony from the victim's fiancee, Joann Rutherford, and the victim's sister, Margaret Sago. The State also presented character and propensity evidence of defendant's other crimes under State v. Jackson, 608 So.2d 949 (La.1992). The evidence, presented through the recorded previous testimony of victim Salvador Campagna, established that in 1975, defendant, with others, committed a previous armed robbery at a barroom. In the earlier incident, the victim was shot once.
Defendant did not testify in either the guilt phase or the penalty phase of his capital trial. The defense presented four witnesses at the penalty phase, including an expert in executive clemency and corrections, defendant's sister-in-law, defendant's wife, and his nine-year-old *1119 stepdaughter. In mitigation, the defense focused on the loving familial relationships that defendant enjoys. La.Code Crim. Proc. art. 905.5(h) (any other relevant mitigating circumstance).

PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS
The minimal publicity the murder received did not infect the venire. Very few prospective jurors indicated even having heard anything about the crimes, and none prejudged defendant as to guilt or innocence.
Race does not appear to have injected itself into these proceedings, although the victim was white, and defendant is African American. Even though the State referenced in its guilt phase opening statement, the anticipated testimony of a witness, mail carrier Marvin Perry, who ultimately did not show up for court, to the effect that he (Perry) would testify he thought it odd that a black man would be drinking in a little white red-neck bar, the allegation of prosecutorial misconduct was considered and found not prejudicial to defendant. As such, no arbitrary factor was interjected by the prosecutor's opening remarks regarding Perry's anticipated testimony.
Defendant's jury was composed of ten whites and two African Americans. Defendant argued that the State discriminatorily excluded prospective jurors on the basis of race, in violation of the rule of Batson; however, these allegations were addressed and found to be without merit. In addition, defendant's claims that the victim's sister's non-responsive request to the jury for the death sentence does not appear to have been the type of comment that would come as a surprise to the jurors. No arbitrary factor appears to have been interjected in this instance. Defendant's argument regarding the testimony of a witness to the prior armed robbery in 1975 were found to be without merit. Finally, trial counsel's penalty phase strategy, as evidenced particularly in his closing argument in which he distanced himself from his client appears to have been part of a cohesive defense tactic, and thus, no arbitrariness appears to have resulted therefrom.

AGGRAVATING CIRCUMSTANCES
The State relied on two aggravating circumstances under La.Code Crim. Proc. art. 905.4(A), and the jury returned the verdict of death, agreeing that both were supported by the evidence: (1) the offender was engaged in the perpetration or attempted perpetration of an armed robbery; and (2) the offender has been previously convicted of an unrelated ... armed robbery. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). As discussed in this opinion and the unpublished appendix, the aggravating circumstances relied upon by the State were fully supported by the evidence. Consequently, defendant's sentence of death is firmly grounded on the finding of these two aggravating circumstances.

PROPORTIONALITY REVIEW
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La.1987). This Court, however, has set aside only one death penalty as disproportionately excessive under the post 1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating *1120 factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 9.
The State's Sentence Review Memorandum reveals that since 1976, 72 cases have originated as first degree murder charges in Jefferson Parish, including defendant's case, and of those, juries have recommended imposition of the death penalty 24 times, including the current case. Twelve of the twenty-four cases in which the jury returned a death sentence involved armed robbery as an aggravating factor.[21] The outline of the cases set forth in the State's sentencing memorandum provides strong support for an argument that the death penalty imposed in this case is not disproportionate. Furthermore, considering the fact that this case is an armed robbery, and that statewide, the cases are legion in which capital sentences have been affirmed based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery, we conclude that the sentence of death is not disproportionate in this case.[22]

*1121 DECREE
For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. Rev.Stat. § 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any State postconviction proceedings, if appropriate, pursuant to its authority under La. Rev.Stat. § 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.
CALOGERO, C.J., dissents and assigns reasons.
JOHNSON, J., dissents.
KIMBALL, J., dissents and assigns reasons.
CALOGERO, Chief Justice, dissents and assigns reasons.
I respectfully dissent from the majority opinion with regard to the reverse-Witherspoon challenges, because the risk that the trial judge's denials of the defendant's challenges for cause might have "infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized." Morgan v. Illinois, 504 U.S. 719, 736, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (internal quotations omitted). With its decision today, the court continues down the slippery slope of granting trial judges unbridled discretion in ruling on challenges for cause in capital cases. See State v. Miller, 99-0192 (La.9/6/00), 776 So.2d 396, 415, Calogero, C.J., dissenting.
The standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Thus, if a prospective juror's inclination toward the death penalty would substantially impair the performance of the juror's duties, a challenge for cause is warranted. State v. Ross, 623 So.2d 643, 644 (La.1993). Although the trial judge's ruling should be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion, State v. Cross, 93-1189 (La. 6/30/95), 658 So.2d 683, "a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to the law may be reasonably implied." State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990).
Initially, I must disagree with the majority's apparent rationale that the merits of defendant's challenges for cause should *1122 be viewed in light of any perceived transgression by defense counsel of the general prohibition on asking jurors to "commit" themselves during voir dire to a particular result. See Ante, p. 1110. Regardless of whether counsel's examination might have exceeded the scope of voir dire, and the trial court made no finding that counsel did so, the fact remains that counsel's rendition of the anticipated evidence was entirely accurate, and counsel asked from jurors no more than what this court has held the State itself may secure from prospective jurors, that is, an indication of whether their views for or against capital punishment may substantially impair their performance as a juror in this case. See State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703 (prospective jurors properly dismissed for cause because the age of the defendant would have impaired their ability to return a death verdict); State v. Frost, 97-1771 (La.12/1/98), 727 So.2d 417 (same); State v. Comeaux, 514 So.2d 84 (La.1987) (prospective jurors properly dismissed for cause because they could not impose death penalty on borderline retardate); see also State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254, 2001 WL 1511864 (unpub'd appx. at p. 9) (prospective juror properly dismissed for cause because he could not consider death penalty under the facts of the case, outlined by the prosecutor as one where the defendant was alleged to have killed his infant son with specific intent).
This court has held that a potential juror who indicates that he will not consider a life sentence, but will instead automatically vote for the death penalty under the particular factual circumstances of the case before him, is subject to a challenge for cause. State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278. I would find that the trial judge abused his discretion in failing to excuse for cause prospective jurors Sintes, Tortorich, and Jordan, who expressed their unswerving inclination to return a death sentence in a case such as the defendant's.
Although Sintes, Tortorich, and Jordan did initially indicate, before any circumstances of the crime alleged were known to them, to have open minds as to the sentence to be imposed, when these prospective jurors learned that the case actually involved the aggravating circumstance of an intentional killing during an armed robbery, their responses quite clearly shifted to foreclose the possibility of returning a life sentence. Besides saying that she would "automatically" vote for death if the defendant intentionally murdered someone during an armed robbery, Ms. Sintes also responded in the negative when asked if any mitigating circumstances could persuade her to consider a life sentence: "If I feel like he did it intentionally, ... I feel like he would get the death penalty." Mr. Tortorich also responded in the negative when asked if he could consider a life sentence if the defendant intentionally killed the victim during an armed robbery: "I don't think I'd consider life imprisonment." Finally, Mr. Jordan was the most emphatic of the three. When asked if he would vote for death if he found the defendant intended to kill the victim, Mr. Jordan stated, "Yes, I will." Then, when asked if anything would persuade him otherwise, he responded, "It's hard to say, but it would have to be pretty strong." The State exerted no effort to rehabilitate these jurors even after defense counsel had elicited such pro-death statements from them. Consequently, these jurors never abandoned their opinion that the only appropriate sentence for a person convicted of an intentional killing during an armed robbery was the death sentence.
Despite such emphatic and implacable stances expressed by the jurors, the majority *1123 now simply accepts without more that the State "seemed confident" and the trial court "appeared satisfied" with the jurors' initial responses that they would have an open mind. Ante, p. 1107. In my view, for the death sentence to be valid under the constitution, the chosen jurors must be open-minded about whether to impose the death penalty, even though the facts permit imposition of such a penalty, because jurors can impose a sentence of life with or without the existence of mitigating circumstances. See State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162; State v. Martin, 550 So.2d 568 (La.1989).
Though the majority characterizes the instant case as similar to State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276, and State v. Taylor, 99-1311 (La.1/17/01), 781 So.2d 1205, the jurors in those cases, displayed voir dire responses that, in the totality, reflected their ability to consider the whole picture before deciding what sentence to impose. For example, in Chester, the prospective juror, we reasoned, was more likely confused as to the relationship between specific intent and mitigating circumstances, but it was clearly evident that she would listen to both mitigating and aggravating circumstances and that she would make a judgment as to the sentence to impose based on the evidence presented in the penalty phase. We found no abuse of the trial court's discretion in denying the challenge for cause because the juror had not expressed an unconditional unwillingness to impose the death penalty under any and all circumstances. There is nothing in the voir dire record on which to base a similar confidence in the ability of the three prospective jurors in the instant case to follow the court's instructions impartially and evaluate all of the evidence presented to them. Viewed as a whole, the responses of Sintes, Tortorich, and Jordan neither evince the balance we found in Chester nor suggest a mere personal preference for the death penalty like we observed in Taylor. Instead, the only fair reading of the entire voir dire responses of these prospective jurors is that they were irretrievably committed to returning a verdict of death in this defendant's case. As such, these prospective jurors should have been excused for cause.
KIMBALL, J., dissenting.
I disagree with the majority's conclusion that the trial judge did not abuse his wide discretion in denying the defense's challenge for cause of the prospective juror, Faith Sintes. In my view, the voir dire record as a whole reveals "facts from which bias, prejudice or inability to render judgment according to law" on the part of Ms. Sintes may be reasonably implied. State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990). When the state asked Ms. Sintes whether she could consider both life imprisonment and the death penalty, she indicated that she could. Later, however, the defense counsel individually asked the panelists if they would automatically impose the death penalty in a situation where they had decided that the defendant had intentionally killed someone during an armed robbery. Unlike some of her fellow panelists who responded that they would want to see the evidence before deciding, that they would consider both penalties, and that they would probably not impose the death penalty automatically, Ms. Sintes responded, "I think I would automatically be in favor of the death penalty." Defense counsel then asked her if she meant that there really would not be any mitigating circumstances he could put on that would persuade her that life imprisonment would be an appropriate remedy. Ms. Sintes answered, "If I feel like he did it intentionally, I think that he wouldI feel like he would get the death penalty."
*1124 I disagree with the majority's view that Ms. Sintes' use of the term "automatically" merely mirrors the defense counsel's use of that same term in the question put to her. Also, in my view, the fact that there was no attempt by the state or the trial court judge to clarify Ms. Sintes' problematic answer does not support a conclusion that no attempt was needed. I find that the voir dire record in this case is sufficiently different from that in State v. Taylor, 99-1311 (La.1/17/01), 781 So.2d 1205 and State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276, and that Ms. Sintes' views on the death penalty are such that they would prevent or substantially impair the performance of her duties in accordance with her instructions or her oath. Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). I therefore conclude that the trial judge erroneously denied the cause challenge of Ms. Sintes, and dissent.
NOTES
[*] Retired Judge Robert L. LoBrano, assigned as Justice Pro Tempore, participating in the decision.
[1] The assignments of error not discussed in this opinion do not represent reversible error and are governed by clearly established principles of law. They are reviewed in an appendix that will not be published but will comprise part of the record in this case.
[2] Theriot estimated that they arrived at the bar at about 11:00 a.m. Kishbaugh stayed at the bar approximately 10 minutes before leaving on another service call. He returned about 20-30 minutes later to pick up Theriot.
[3] Tapes of the 9-1-1 calls by Jerrie Twin and Lazarine were introduced at trial.
[4] A discussion of the assignments of error concerning Batson challenges to these prospective jurors is treated in the appendix.
[5] During general voir dire, Richardson introduced herself as a resident of Harvey, a single mother employed as a word processor operator for four years. In addition, she confirmed for the prosecutor that if the State proved its case, she could return a verdict of guilty. The defense posed no questions to Richardson.
[6] In J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the Supreme Court extended Batson and its progeny to prohibit the exercise of peremptory challenges on the basis of gender.
[7] The State also points out that the presiding judge in the instant case is an African American jurist. Judge Green's sensitivity and efforts to seat a constitutional and racially-diverse jury for defendant, is evidenced in the debate over Richardson. Even though the judge originally found the state's race-neutral reasons as to Richardson valid, he became concerned about the exclusion of African Americans from defendant's jury. However, the judge's race is not relevant to Batson analysis. See State v. Tilley, 99-0569, p. 8 (La.7/6/00), 767 So.2d 6, 15 (holding that the race of the prosecutor is irrelevant).
[8] A discussion of the assignments of error concerning challenges for cause of the other prospective jurors is treated in the appendix.
[9] The rule is now different at the federal level. See United States v. Martinez-Salazar, 98-1255 (1/19/00) 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) (exhaustion of peremptory challenges does not trigger automatic presumption of prejudice arising from district court's erroneous denial of a cause challenge).
[10] The "substantial impairment" standard applies to reverse-Witherspoon challenges. In Morgan v. Illinois, 504 U.S. 719, 738-39, 112 S.Ct. 2222, 2234-35, 119 L.Ed.2d 492 (1992), the Supreme Court held that venire members who would automatically vote for the death penalty must be excluded for cause. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of aggravating and mitigating circumstances, thus violating the impartiality requirement of the Due Process Clause. Id. at 2229. The Morgan Court adopted the Witt standard for determining if a pro-death juror should be excused for cause.
[11] An example of the state's opening queries to each panel in the death qualification rounds follows:

STATE: As the Judge has told you, in all first degree murder trials, the trial is by law bifurcated. That is, it's made up into two parts. And what we have to do at this particular stage is, we're going to put the cart before the horse so to speak, and we're going to voir dire you or question you on phase two; that is, the penalty phase. We're going to talk to you about the voir dire on phase one at a later time. And what happens in a first degree murder trial is that after the defendant is convicted of first degree murder, and only first degree murder, nothing else, then we go to what's called the penalty phase. That phase, and that's the only time in Louisiana, that a juror is asked to decide what the sentence should be. The jury is asked to [choose] between only two possible sentences. One is life imprisonment, and one is the death penalty. * * * Let me explain it to you how it works now. If in fact we produce evidence that shows that the defendant in fact [is] guilty of first degree murder, when you start deliberating in the second phase, or start the second phase, actually, the State is going to be allowed to try to produce reasons of what's called aggravating factors. And the defense is allowed to produce what is called mitigating factors. And you are to consider, it's not a weighing process. It's not well, if you've got three of these and two of these, you vote this way. It's you listen to all of the evidence and you come back and make a binding recommendation of life imprisonment or the death penalty. Do you think you're the kind of person that's able to consider the death penalty or no?
Typically, the prosecutor would then query each panelist as to their "feelings on the death penalty." In the event the prospective juror indicated a willingness to return a death verdict, the prosecutor would then follow-up with a question like, "Under the appropriate circumstances, you could vote for the death penalty, and in the appropriate circumstances, you could vote for life imprisonment?"
[12] Defense counsel informed every panel during the Witherspoon voir dire about the elements of first degree murder, especially that defendant was charged with killing Ben Scorsone, not as an accident, but as an intentional act during an armed robbery of a barroom, disclosing that the victim, a Budweiser beer distributor, coincidentally arrived at the bar during the robbery, and courageously intervened when he was shot.
[13] Defendant was previously convicted in 1975 for committing an armed robbery on May 30, 1974, at Nunez's Restaurant. According to the testimony from the 1975 trial, defendant, and Bernell Thompson and Jo Ann Paul, arrived at Nunez's after midnight. Salvador Campagna was having a drink at the bar after having gotten off work earlier from tending bar at another establishment. During the robbery, Mr. Campagna was shot, but survived the injury, and at trial, identified defendant as the shooter. Another witness, Anne Sue Gurganus, testified that the other male fired the shot. Defendant and Thompson were tried together, but neither defendant was charged with attempted first degree murder or battery. Defendant and Thompson were both found guilty as charged of armed robbery, and each sentenced to 30 years imprisonment at hard labor.
[14] The State introduced a bill of information, charging that on May 30, 1974, defendant, and another man and woman, robbed Anne Sue Gurganus, while armed with a dangerous weapon; minute entries from trial dates of February 18 and 19, 1975, after which jury returned guilty verdict; and minute entries from March 31, 1975 and April 14, 1975, after which the trial court imposed a sentence of 30 years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
[15] This assignment of error is discussed further in the unpublished appendix.
[16] The State offered evidence of defendant's previous armed robbery, which the trial court admitted in the penalty phase, with the following colloquy:

THE STATE: All right. At this time I would also like the Court to take notice of Exhibit 4, which was the complete copy of the records [of] Mr. Ball. I believe it's going to be for the Court, only, and the State would like to introduce State's Exhibit 4 A, which is the certified copy of the bill of information charging the defendant, Elzie Ball and Bernell Thompson with armed robbery. Also the minute entries representing the trial of the matter and the conviction of Mr. Ball for armed robbery and finally the sentence of Mr. Ball in this case for being convicted of armed robbery.
DEFENSE: I just note the exception I noted previously.
THE COURT: Your objection is noted. The exhibit is admitted.
[17] Counsel asked Dean Burke Foster the following question:

Q: Now earlier this jury was provided with an exhibit indicating that Mr. Ball had been convicted in 1974 of an armed robbery and sentenced to thirty years. If he were released from the penitentiary in 1991, can you tell us from your experience what kind of release it would have been that he would have gained?
A: Armed robbery is not a parolable offense, so it would of been a good-time release.
This was not irrelevant information for the jury, as Prof. Foster went on to explain that under good-time credits, defendant "would have earned approximately half of the time off of that sentence." Further, the State suggests that this information was helpful to the jury because it showed that defendant could adapt well to prison life, in the event the jury determined that he be sentenced to life imprisonment. Still further, the information was helpful to defense counsel, so that the expert could then distinguish between a good-time release, such as defendant earned on his armed robbery conviction, as opposed to life imprisonment, for which such a release is not available.
[18] Cf. State v. Sonnier, 379 So.2d 1336, 1371-72 (La.1979) (reversing death sentence and remanding for a new trial on the penalty issue after finding that the jury, which had previously been informed during the sentencing hearing that defendant was quite capable of renewed irrational and aggressive behavior, could have concluded that the defendant would be eligible for work release, creating juror fear, an arbitrary factor which may have contributed to the sentence.).
[19] The specific portion of the state's rebuttal argument in the penalty phase about which defendant now complains is reproduced as follows:

But you know what I couldn't help noticing? May I see the certified copy of the conviction? ... But I couldn't help noticing that this happened in 1975 and he was given thirty years and if I do my math right, we ain't got there yet. We ain't got to that year yet, but yet, in 1996, he kills Ben Scorsone. Nine years before he is even supposed to be out.... And you know the best part about that thirty year sentence? Thirty years hard labor, without benefit of parole, probation, or suspension of sentence. It's in here. You all read it. Same thing that his attorney is now telling you. He's going to do life without benefit of probation, parole or suspension of sentence.
[20] Unlike the debate surrounding the commutation instruction which this Court addressed in various decisions before rendering Loyd, the issue there was whether juries should consider whether defendant would ever "get out" in the future on the instant murder conviction by operation of a governmental decision, i.e., executive clemency. See e.g., State v. Jones, 94-0459 (La.7/5/94), 639 So.2d 1144; State v. Jordan, 420 So.2d 420 (La.1982); State v. Brown, 414 So.2d 689 (La.1982); State v. Willie, 410 So.2d 1019 (La.1982); State v. Lindsey, 404 So.2d 466, 483 (La. 1981). This Court held in Loyd, following the 1995 amendment of La. Const. art. I, § 16, that juries are entitled to be informed of a governor's power of commutation. 96-1805, p. 18, 689 So.2d at 1331 ("Louisiana's instruction is an even-handed one which accurately informs jurors that a death sentence as well as a life sentence remains subject to executive revision").

The reenactment of La.Code Crim. Proc. art. 905.2(B) and this Court's holding in Loyd has diminished the force of Lindsey and its progeny. Notwithstanding these historical developments, Lindsey and its progeny have not been completely superseded, see Loyd, 96-1805, p. 1, 689 So.2d at 1336 (Lemmon, J., concurring).
Nevertheless, the historical developments, when viewed in conjunction with aggravating circumstance of a capital defendant's previous criminal history, see La.Code Crim. Proc. art. 905.4(A)(3), must yield to the inevitable. In other words, the very serious violent crimes recited in art. 905.4(A)(3) (murder, aggravated rape, aggravated burglary, aggravated arson, aggravated escape, armed robbery, or aggravated kidnapping), all come with commensurately hefty sentences. To ask the jurors to consider one (the fact of the serious conviction) without considering, or even informing them of, the other (the sentence) would leave unaddressed the "jurors' expectation about what proper proof should be." Old Chief v. United States, 519 U.S. at 172, 117 S.Ct. 644.
[21] State v. Berry, 391 So.2d 406 (La.1980) (Defendant fatally shot a law enforcement officer during a bank robbery); State v. Lindsey, 543 So.2d 886 (La.1989) (Defendant killed a shopper in the Oakwood Mall parking lot); State v. Robinson, 421 So.2d 229 (La.1982) (Defendant killed the husband of an apartment complex manager in her presence during an armed robbery-death sentence vacated, life sentence on remand); State v. Taylor, 422 So.2d 109 (La.1982) (defendant stabbed the victim multiple times and stole his car); State v. Nelson, 459 So.2d 510 (La.1984) (defendant robbed and stabbed victim who had picked him up hitchhiking to New Orleans; conviction reversed, life sentence on retrial); State v. Tassin, 536 So.2d 402 (La.1988) (defendant shot two victims, one fatally, in the course of an armed robbery/drug deal); State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368 (defendant killed a cab driver in the course of an armed robbery); State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000) (Defendant shot two of his co-workers, one fatally, during the course of an armed robbery); State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276) (defendant killed a cab driver during the course of an armed robbery); State v. Taylor, 99-1311 (La.1/17/01), 781 So.2d 1205 (Defendant killed a 69 year old employee of Rhodes Drug Store, during an armed robbery attempt.); State v. Ryan Matthews, (appeal not yet filed in this court) (Defendant shot the and killed the victim/owner, and shot at an eye-witness, during a convenience store robbery). The twelfth one is that of defendant in this case.
[22] See, e.g., State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999) (defendant shot and killed two people, and injured two people during the course of an armed robbery); State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000) (defendant and co-defendant shot and killed police officer escorting grocery store manager who was making a night deposit); State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999); State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703 (defendant murdered victim while attempting to rob him in his truck; earlier that day, defendant had shot and wounded another victim during the attempted perpetration of an armed robbery); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 (during armed robbery in a Cajun Fried Chicken restaurant where defendant had previously been an employee, he shot and killed one employee and shot and permanently disabled and paralyzed another); State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326 (defendant, while engaged in the armed robbery in a Church's Fried Chicken, shot and killed one of the employees); State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865 (defendant kidnapped the victim while stealing his truck and ultimately drove him to a secluded area and shot him three times in the head).