996 So.2d 421 (2008)
STATE of Louisiana, Appellee
v.
Trukeeia N. LITTLETON, Appellant.
No. 43,555-KA.
Court of Appeal of Louisiana, Second Circuit.
September 17, 2008.
*423 Louisiana Appellate Project By: Paula Corley Marx, for Appellant.
Jerry L. Jones District Attorney, Josephine P. Heller, Holly A. Chambers-Jones, Assistant District Attorneys, for Appellee.
Before BROWN, DREW and LOLLEY, JJ.
DREW, J.
Trukeeia N. Littleton was convicted at jury trial of aggravated second degree battery. Sentenced to 10 years' imprisonment at hard labor, she now appeals her conviction and sentence. We affirm in all respects.

FACTS
Trukeeia Littleton was charged by bill of information with committing aggravated second degree battery upon Janika Johnson on November 14, 2006. The two had hard feelings for each other involving a common boyfriend, a child born outside of marriage, and child support payments. The trial evidence shows that Johnson showed up, with an attitude, at the McDonald's where Littleton worked. The two had an altercation with some swinging and grabbing across the counter. Johnson was in the process of walking out of the restaurant when Littleton ran up behind her with a large measuring cup containing hot grease and threw it in the direction of Johnson's face. All of this was captured on the restaurant's video camera system.

TESTIMONY
1. Gerald Joseph Poulan was a McDonald's district manager and was in the restaurant, getting some food, when the incident took place. He noticed a group of females walk in; one of them went to the counter and began talking to Littleton. Poulan then testified as follows:
A. [N]ext thing that happened was, ah, Trukeeia just over the counter and, ah, it instilled a little commotion. The other, the victim, ah, defended herself or tried to swing back or whatever you want to call it, ah, and *424 I immediately in turn, ah, told the group of girls and the customer to leave the premises or I call the police, and they did. They started turning around and walking out. A couple had already started to anyway, and, uh, I turned around and watched them, ah,Their back was towards me and Trukeeia came flying past me and just next thing you know you heardCan I say what shewhat I heard?
Q. Yeah.
A. It's a cuss word. Okay. She said, "Hey, bitch", and, ah, the victim turned around and
BY THE REPORTER:
The witness makes a swishing noise.
A. whole cup of oil in her face.
Poulan testified that after the attack, the victim "spazzed out," "was hollering," and "her hair, ah, you know, was even throwing a little bit of smoke off."
After Poulan reviewed and verified the restaurant video that he had personally retrieved, and after some argument and testimony about chain of custody, the video of the incident was admitted into evidence and played for the jury, with Poulan providing narration. Poulan testified that the cup that held the hot grease could hold 38 ounces and that the oil in the french fry vats was at a temperature of either 335 or 360 degrees.
On cross-examination, Poulan denied hearing the victim say to Littleton when they were at the counter, "I'll kick your ass" or "You're weak." He also indicated that he did not know if the victim had been in the restaurant earlier in the day. When he was asked whether, after the initial altercation, he heard the victim, Janika Johnson, say, "I wish that brick hit your baby," the state objected, and the jury was removed. The state's objection was based on the trial court's earlier ruling on the motion in limine.
Defense counsel argued that while he could not discuss a prior act, he could discuss what Johnson said contemporaneously at the time the incident took place. The trial court nonetheless sustained the state's objection. The jury then was brought back in, the court told the jury that the question was improper and was to be disregarded.
Poulan admitted that he had seen Johnson talking on a cell phone in the video, but he denied hearing her say, "The bitch won't come out." He did not know how much oil was in the cup used by Littleton.
2. Maria Calloway, a friend of Johnson's, testified that on the day of the incident, she and her cousin, Donessa Ruff, accompanied Johnson to the McDonald's to get something to eat. According to Calloway, she and Ruff sat at a table, eating chicken nuggets, when Littleton and Johnson had the altercation at the counter. Calloway indicated she could not hear what Littleton and Johnson were talking about before the altercation, but Calloway broke it up; Poulan then told them to leave at once or he would call the police. As they began to walk out, Calloway saw Littleton throw the grease on Johnson. Calloway then took Johnson, who was in shock, to the emergency room. When asked what she observed physically about Johnson, Calloway responded, "The grease had started making her skin bubble up and it just startedwhen she was wiping it with the paper towel it was falling off in the paper towel." Calloway also stated that the grease caused the hair weave Johnson was wearing to begin to melt.
On cross-examination, Calloway denied hearing Johnson tell Littleton before the altercation, "I'll kick your ass" or "You're weak." She also denied hearing Johnson make any kind of threats, she did not *425 remember Johnson being on the phone with anyone, and she denied having been to the McDonald's with Johnson earlier that day. On redirect, Calloway was asked what Johnson was doing before the altercation and before Littleton came to the counter. She responded:
I know she asked one young lady at the cash register was Trukeeia there. I remember her questioning the girl asking her was Trukeeia there and the girl asked her what was her name, and she told her and she told Trukeeia that Janika had wanted her. So she told her to hold on and that's why Janika was still standing there.
Calloway again denied hearing any threats made by Johnson.
3. Dr. Gary Lowder treated Johnson at the emergency room following the incident. Through his testimony, Johnson's hospital medical records were admitted into evidence. Dr. Lowder testified that:
 when Johnson was treated at the emergency room, she had a combination of first and second degree burns on her arms, forehead, and upper chest, redness on the skin on the lower parts of her arms, and blisters on her upper arms;
 Johnson's face and upper chest were blistering, and skin was already coming off her arms;
 Johnson was crying and saying she was in pain, for which she was given a couple of doses of a narcotic analgesic;
 second degree burns leave scarring, and whether or not the body would ever return to a normal state, depended on the depth of the second degree burn, "but quite often not";
 second degree burns take about three weeks to heal; deep second degree burns normally take two to three months to heal; and
 after examining Johnson in the courtroom, he testified that she had suffered scarring as the result of her burns and that the scarring was in the same place she was burned.
4. Janika Johnson testified that:
 she was pregnant by her boyfriend, Valdez Rogers, who was the ex-boyfriend of Littleton;
 on the evening of the incident, she, along with Maria and Donessa, had been playing cards at Johnson's house;
 they decided to stop at McDonald's to eat;
 she did not know whether Littleton was working at the McDonald's that night, but knew she was employed there;
 after placing her order, Johnson asked a worker at the counter if Littleton was there;
 the employee responded affirmatively, asked her what her name was, and then told Littleton, who came to the counter;
 after a brief conversation, she told Littleton, "I heard you had to pay a fine";[1]
 Littleton struck her in the face;
 she (Johnson) began to defend herself by fighting back;
 the two were separated, and the manager told Johnson and her companions to leave before he called the police;
 as they were leaving, she heard footsteps, then heard Littleton say, "Hey Bitch";
 before she (Johnson) could turn around completely, Littleton threw the cup of grease, which, when it hit her skin, made a hissing sound;

*426  the grease melted the extensions in her hair;
 when she (Johnson) got into her vehicle, she began to panic, once she realized that her skin was coming off; and
 she felt severe pain that she rated as a 10 on a scale of 1 to 10.
Johnson then narrated as the store's video played for the jury, after which she testified that:
 she was taken to the hospital;
 she was photographed the next day by her boyfriend's mother;[2]
 she was also photographed by Detective Willis;
 she had to drop out of school;
 her mother took care of her daughter because she was not able to see the child on account of the fluid from her forehead which had swollen her eyes shut;
 she was not able to spend Thanksgiving with her daughter or see her at Christmas, because of the injury;
 it was difficult explaining to her daughter what had happened to her;
 she was not an enemy of Littleton's at the time of the accident, but they weren't friends either;
 she did not visit McDonald's earlier that day;
 she did not tell Littleton, "I'll kick your ass";
 she did not tell Littleton, "You're weak";
 she was talking to Valdez Rogers on her cell phone that night and denied saying, "The bitch won't come out"; and
 after the altercation, she used "the `B' word" and said something like, "Bring it `B'," or, "Come on `B'."
5. Officer Brant Heath of the Monroe Police Department testified that he went to the ER that night and saw Johnson's burns. He spoke with Johnson and Calloway, and received the video from Poulan.
6. Detective James R. Willis of the Monroe Police Department testified that:
 he took a statement from Littleton the day after the incident after she waived her Miranda rights;[3]
 Littleton indicated that she reached across the counter to strike Johnson after Johnson made a statement that upset her;
 the two females continued mouthing at each other;
 Littleton admitted leaving the counter area, dipping a metal cup into a vat of grease, chasing after Johnson, and dashing the grease on Johnson;
 when he showed Littleton a photo of Johnson's face, Littleton exhibited no reaction;
 when he asked Littleton if she was remorseful, she replied that, "I kind of am and kind of aren't";
 he took and identified his photos of Johnson;
 Littleton had come to the police department voluntarily to tell her side of the story;
 she told him that Valdez Rogers was the father of her baby, that Rogers and Johnson were in a relationship, and that friction started when Littleton filed for child support against Rogers;

*427  she told him that she tried to avoid Johnson earlier in the day;
 Johnson called her a "stupid bitch who put Valdez on child support";
 Littleton had told Johnson, "if you keep on coming up here playing with me I'm going to kick your ass"; and
 Littleton indicated to him that Johnson had told her, "I'm going to whip your ass in front of everybody. You're weak."
7. Cassandra Ross testified that:
 she was working at the McDonald's on the night of the incident;
 Johnson had not been in the previous day;
 she overheard Johnson talking on the phone and saying that she was in McDonald's, that "the bitch won't come out from the back," and "she was going to beat her ass when she come from the back";
 Johnson repeatedly called Littleton to the front and repeatedly indicated that it was for the purpose of kicking her ass;
 Littleton refused to come to the front initially, but Johnson persisted;
 Johnson was being loud, and was looking for trouble;
 she informed her manager, Karen Franklin, about the situation with Janika Johnson (prior to the fight);
 Littleton asked Franklin if she could leave;
 Franklin told Littleton she could leave;
 Littleton said she was going to call her mother to pick her up;
 Ross offered Littleton the keys to her car so she could leave, but Littleton wouldn't take them; and
 Poulan could hear what the women were saying.
8. Richard Dixon testified that:
 Janika Johnson had come to the McDonald's a couple of days before the incident and had made telephone calls to Littleton, hanging up when she answered;
 Johnson would come through the drive-through, "picking her and stuff;
 he saw the fight between Johnson and Littleton;
 Johnson threatened Littleton "from the beginning when she came in the door," saying, "Where that bitch at? I'm tired her lying on me. I'm fixing to whip her ass";
 Franklin heard Janika Johnson, but didn't ask her to leave;
 Littleton got permission to leave, though she didn't leave;
 after the initial struggle, Janika Johnson said something to Littleton before the grease was thrown;
 he did not see the first punch thrown by Littleton; and
 when asked how he got to the front to see the grease thrown, he testified:
A. I had just walked out when, ah, when she hadwhen, ah, when the girl say, When I threw that brick I should have, ah
Q. Ah,
A. I should have hit your baby.
BY THE COURT:
Hold on. Hold on, Mr. Dixon.
BY MR. DIXON:
All right.
A. I had just walked out whenwhen that statement was made.
9. Karen Franklin testified that:
 on the day of the incident, she had granted Littleton's request to leave, but asked Littleton to wait until she counted Littleton's cash (from the drive-through window);

*428  she took Littleton's headset and began taking drive-through orders;
 suddenly, she heard "a loud commotion," saw Littleton fighting, pulled her off the victim, and went to the office to call the police;
 she then heard a loud noise, and returned to find the women running out of the store after the grease had been thrown;
 she never saw the women come into the store and did not hear any threats by Janika Johnson; and
 she did not hear anyone being loud or obnoxious, and no one told her that anyone was threatening Littleton.
The six-person jury found Littleton guilty as charged.

DISCUSSION

Excessiveness
At sentencing, the trial court noted that:
 aggravated second degree battery is punishable by a fine of not more than $10,000 or imprisonment with or without hard labor for not more than 15 years, or both;
 it had considered the facts, the relevant law, the Presentence Investigation ("PSI"), the sentencing guidelines of Article 894.1, the evidence adduced at the sentencing hearing, and all filings on behalf of the victim and the defendant; and
 Janika Johnson had submitted two letters describing her continuing mental anguish because of her injuries, including that she selected clothing to hide the scarring, that the scarring caused her great emotional pain and embarrassment, that she wore her hair differently to hide the scarring to her forehead, that she had to apply heavy concealers to cover the scarring to her face and neck, and that a plastic surgeon told her she would need extensive plastic surgery procedures, which would cause additional pain and suffering and emotional trauma, should she elect to undergo them.
With respect to Article 894.1 in particular, the court stated that it found these aggravating factors:
(1) Littleton's conduct manifested deliberate cruelty; the court believed Littleton chose hot grease to maim and disfigure; Littleton approached Johnson and shouted "a provocative expletive" in an attempt to cause the victim to expose her facial area in order to maximize the harm Littleton intended to inflict;
(2) the defendant knowingly created the risk of great bodily harm to more than one person because bystanders could have been injured;
(3) this was a crime of violence;
(4) the offense resulted in significant permanent injury to the victim;
(5) Littleton used a dangerous weapon in commission of the offense; and
(6) Littleton showed little or no remorse for her actions.
The court then stated that it found no mitigating circumstances or factors in the case, noting that Littleton did not act under strong provocation, nor were there substantial grounds tending to excuse or justify her conduct. The court then found Littleton in need of correctional treatment that could most effectively be provided by commitment to an institution, and that a probated or lesser sentence would deprecate the seriousness of the crime. Littleton then was sentenced to 10 years at hard labor with credit for time served. A motion for reconsideration of sentence was filed, asserting that the sentence was excessive because Littleton was a first-time *429 offender. The trial court denied the motion without a hearing.
Defendant argues that just before the hot grease was thrown, Johnson told Littleton that she wished she had hit her baby with the brick she had thrown at Littleton's house. The defendant argues that while this evidence was excluded at trial, it was the precipitating factor leading up to the battery and should serve as a mitigating factor for sentencing purposes. In addition, the defendant asserts that the young age (28) of this first felony offender, potential for rehabilitation, family ties, and the need to support young children are additional mitigating factors that should have been considered. On excessiveness in particular, the defendant argues that incarceration for 10 years makes no measurable contribution to acceptable penal goals and is nothing more than needless imposition of pain and suffering.
The state argues that the trial court meticulously articulated and thoughtfully listed its findings of aggravated circumstances, and that Article 894.1 does not require that the court must find mitigating circumstances. The state asserts that, immediately after the attack, the video shows that Littleton did not act under strong provocation, and that the video captures "what appears to be a prideful and anything but remorseful Trukeeia Littleton." Finally, the state points out that the trial court has broad sentencing discretion and argues that the sentence imposed, rather than being excessive, "is rather appropriate and commensurate" with the choice Littleton made on the day of the incident.
Our jurisprudence on reviewing sentences is well settled.[4]
*430 Littleton was indeed a young first felony offender with two small children. This mitigating factor should have been mentioned at sentencing.
On the other hand, the court did a good job of articulating aggravating circumstances, and the court cannot be said to have erred in concluding that Littleton did not act under strong provocation. Johnson certainly appears to have been looking for trouble and apparently had been harassing Littleton in the past, but neither that, nor her remark about wishing the brick had hit Littleton's baby, excuses or justifies Littleton going over to the vat of hot oil after the altercation with Johnson had ended, scooping out a cup, pursuing Johnson, and throwing the hot oil on her. The trial court well articulated the factual basis for its sentence. The question becomes whether the sentence was grossly out of proportion to the seriousness of the offense, or nothing more than a purposeless and needless infliction of pain and suffering.
Littleton was administered an upper midrange hard labor sentence. She was not fined, even though La. R.S. 14:34.7 allows a fine of not more than $10,000. While she is a first felony offender, her PSI reflects a three-page rap sheet that includes thefts, shoplifting, and traffic violations. The last page of the PSI indicates that Littleton had a trial date set in November 2007 for issuing worthless checks, felony theft, criminal conspiracy, and misrepresentation at booking. Moreover, the scalding incident would certainly qualify as one of the worst kinds of aggravated second degree batteries, and it is fortunate that the victim wasn't hurt much worse.
All things considered, the sentence is appropriate, and it does not shock the sense of justice.

Jury Selection
During jury selection, potential juror Amanda Alexander informed the court, "Ah, my husband told me that I needed to tell y'all that he's in the Klan, he's a Klan member...." She indicated that she was embarrassed by it, and that her husband had been in the Klan for about two months. When asked if she shared his beliefs, she stated, "No. Not with a lot of it I don't." She also denied any racial bias that would cause her to vote guilty because the defendant was African-American. She denied going to any Klan meetings or wanting to "be thought of as somebody who looks down on people with just because of their color." On the other hand, she would not deny that her husband might hold it against her if she voted not guilty because the state failed to meet the burden of proof. However, when asked if she was concerned that her relationship with her husband might influence her, she responded that she made her own decisions. When asked if her husband may hold a not guilty verdict against her, she responded, "No, because I do that all the time. I make my decisions regardless of what he feels or thinks." She denied that *431 she would be in any physical danger, but admitted he might verbally browbeat her. She then indicated that her husband knew she wanted no part of the Klan; she stated that she did not want to be associated with it, indicated his connection with the Klan would not have any bearing on her decision whether to vote guilty or not guilty, and affirmed that she could abide by the jury instructions and hold the state to the burden of proof beyond a reasonable doubt.
In denying the defendant's challenge for cause, the trial court stated in pertinent part:
She did state that she makes up her own mind and she could weigh the evidence and be fair and impartial. That she did not agree with her husband's beliefs. Ah, in fact she stated she was quite embarrassed by those beliefs. This is unusual and quite frankly I'm surprised that she even brought that up and especially in light of the fact that it caused her a great deal of embarrassment. But, she was emphatic about the fact that she makes up her own mind, that she could listen, weigh the evidence and render a fair and impartial verdict, and I don't believe that there, ah, a husband's beliefs or, ah, or, ah, political beliefs, race or social beliefs automatically rise to the level of being grounds for a cause challenge, and II believe that she was being very candid, forthright and honest in her responses and that she could in fact be fair and impartial and that that may be a more in lines with a situation where a peremptory challenge could be exercised. But, the Court does not believe that athat a cause challenge should be issued in this particular case. So, the Court would, ah, would deny the motion to challenge for cause with regard to Amanda Alexander.
The defendant argues that the entirety of Ms. Alexander's responses on voir dire established that she could not be fair and impartial due to the consequences she would suffer from her husband. The state argues that Alexander's candid responses were indicative of her impartiality.
Our laws on reviewing the denial of challenges for cause are well settled.[5]
All peremptory challenges were indeed exercised, but the defendant did not show an abuse of the trial court's broad discretion in denying the challenge for cause. Alexander voluntarily revealed the troubling information on her own, and her responses as a whole show that the court's denial of a challenge for cause was well within the court's discretion. Furthermore, the trial court's previously quoted reasons for denying the challenge show that the trial court gave careful attention to Alexander's statements.

Exclusion of Evidence
The state filed a pretrial motion in limine to exclude admission of extrinsic acts of the victim for the purpose of showing "bias, prejudice, or interest" under La. *432 C.E. art. 607. The trial court denied the motion after a hearing held just before the beginning of jury selection.
The state sought a writ, granted by this court, wherein we vacated the ruling below and remanded with instructions to deny the admission of any previous allegedly criminal acts of the victim directed at the defendant, unless, in compliance with La. C.E. arts. 404 and 403, there was evidence of an overt act or hostile demonstration by the victim at the time of the crime charged, and the admission of the evidence would not result in undue prejudice, confusion of the jury, or undue delay or waste of time.
This court stated that admission of evidence of criminal acts allegedly committed by the victim against the defendant months prior to the crime charged, in the absence of an overt act or hostile demonstration by the victim at the time of the crime, violated La. C.E. art. 404, and that assuming arguendo such evidence was relevant under La. C.E. art. 401, the admission of such evidence appeared to violate the balancing tests contained in La. C.E. art. 607(D)(2) and La. C.E. art. 403, as well as the express prohibition contained in La. C.E. art. 404.
Defendant proffered that had her witnesses testified, testimony would have been elicited that:
 continuing altercations between the defendant and the victim began after the defendant filed a paternity action against a man (Valdez Rogers) with whom the victim was living;
 numerous acts of vandalism committed by Johnson, including slashing Littleton's tires and throwing a brick at her house;
 other occasions of harassment and threats by Johnson against Littleton; and
 Johnson made a comment to Littleton (after the tussle over the counter, but before the oil was thrown), to the effect that she wished the brick had hit Littleton's baby.
Our Code of Evidence is of assistance here.[6]
*433 The defendant acknowledges the previous instructions of this court, but nonetheless argues that the application of the evidentiary rules has resulted in a denial of due process, in that evidence of Johnson's threats and prior criminal acts against Littleton was excluded, although exculpatory or mitigating in nature, resulting in evidentiary rules superseding the fundamental right to present a defense.
The state correctly argues that the video shows no hostile demonstration or overt act by Johnson, who was actually leaving before the grease was slung. The state also argues that to introduce acts, altercations, or threats between the two prior to the date of the incident would create unfair prejudice under La. C.E. art. 403. Finally, the state argues that the defendant is asking this court to reverse itself on its own ruling, and that great deference should be accorded to an appellate court's pretrial decision on admissibility of evidence unless it is apparent in light of the subsequent trial record that the decision was patently erroneous and unjust.
The state clearly has the better argument. This court's prior ruling on the admissibility of Johnson's previous allegedly criminal acts was correct. Admission of evidence of Johnson's acts prior to the day of the incident, even if relevant, would have eviscerated the provisions of La. C.E. art. 404(B)(2). Most importantly, there was no overt or hostile act at the time of the offense. The unpleasantness between Johnson and Littleton was over well before Littleton went to get the hot grease.
Even though the evidence of the victim's prior acts was properly excluded, the jury was made privy to much of the proffered evidence. The testimony of other witnesses established Johnson at the McDonald's the day prior to the battery, and, in particular, the testimony of Richard Dixon brought in Johnson's statement about wishing the brick had hit Littleton's baby. The state made no objection to Dixon's statement, which was the only evidence from the day of the incident that the defense proffered. There is no question that the jury was made aware of the animosity between Johnson and Littleton. The testimony could not have made this more apparent. None of the assignments of error have any merit.

DECREE
The defendant's conviction and sentence are AFFIRMED.
NOTES
[1] The trial court refused to allow the prosecution to pursue this line of questioning.
[2] The photos were allowed into evidence and published to the jury, as were the photos taken by Det. Willis.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La. 1983); State v. Lathan, 41,855 (La.App. 2d Cir.2/28/07), 953 So.2d 890, writ denied, 07-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Hampton, 38,017 (La.App. 2d Cir. 1/28/04), 865 So.2d 284, writs denied, 04-0834 (La.3/11/05), 896 So.2d 57 and 04-2380 (La.6/3/05), 903 So.2d 452. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La. 1981); State v. Haley, 38,258 (La.App. 2d Cir.4/22/04), 873 So.2d 747, writ denied, 04-2606 (La.6/24/05), 904 So.2d 728. There is no requirement that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La.App. 2d Cir. 12/13/06), 945 So.2d 277, writ denied, 07-0144 (La.9/28/07), 964 So.2d 351; State v. Jones, 33,111 (La.App. 2d Cir.3/1/00), 754 So.2d 392, writ denied, 00-1467 (La.2/2/01), 783 So.2d 385.

Second, a sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 01-2574 (La. 1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La. 1993); State v. Bonanno, 384 So.2d 355 (La. 1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La. 1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La. 1992); State v. Robinson, 40,983 (La.App. 2d Cir.1/24/07), 948 So.2d 379; State v. Bradford, 29,519 (La.App. 2d Cir.4/2/97), 691 So.2d 864.
A defendant's lack of remorse is a proper sentencing consideration. State v. Shipp, 30,562 (La.App.2d Cir.4/8/98), 712 So.2d 230, writ denied, 98-1199 (La.9/25/98), 724 So.2d 775; State v. Daniels, 607 So.2d 620 (La.App. 2d Cir. 1992).
The trial judge is given a wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion. State v. Williams, 03-3514 (La. 12/13/04), 893 So.2d 7; State v. Thompson, 02-0333 (La.4/9/03), 842 So.2d 330; State v. Hardy, 39,233 (La.App.2d Cir. 1/26/05), 892 So.2d 710. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. State v. Cook, 95-2784 (La.5/31/96), 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. Id.
[5] A defendant may challenge a juror for cause on the ground that the juror is not impartial, whatever the cause of his impartiality. La. C. Cr. P. art. 797(2). To prove that there has been reversible error in denying a challenge for cause warranting reversal of the conviction and sentence, a defendant must show: (1) the erroneous denial of a challenge for cause, and (2) the use of all his peremptory challenges. State v. Gipson, 37,132 (La.App. 2d Cir.6/25/03), 850 So.2d 973, writ denied, 03-2238 (La. 1/30/04), 865 So.2d 75. Because a reviewing court is charged with determining whether a trial judge's denial of a defense cause challenge was an abuse of the court's broad discretion, the voir dire record as a whole merits scrutiny. State v. Ball, 00-2277 (La. 1/25/02), 824 So.2d 1089, cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002).
[6] Art. 401. Definition of "relevant evidence"

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
Art. 402. Relevant evidence generally admissible; irrelevant evidence inadmissible
All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible.
Art. 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
Art. 404. Character evidence generally not admissible in civil or criminal trial to prove conduct; exceptions; other criminal acts
* * *
B. Other crimes, wrongs, or acts.
* * *
(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible; provided that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible.
Art. 607. Attacking and supporting credibility generally
* * *
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
* * *
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.